54 A.3d 332

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Donte THOMAS, Appellant.**

Supreme Court of Pennsylvania.

Argued March 6, 2012.

Decided Oct. 24, 2012.

James S. Bruno, Glenside, for Donte Thomas.

Hugh J. Burns Jr., Philadelphia District Attorney's Office, Christopher D. Carusone, Philadelphia, Amy Zapp, Harrisburg, PA Office of Attorney General, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Justice McCAFFERY.

This is a direct appeal from a judgment of sentence of death on one count of first-degree murder. We affirm.

On September 18, 2007, a jury found Donte Thomas ("Appellant") guilty of first-degree murder in the February 3, 2006 shooting death of Tyreese Gaymon a/k/a Tyreese Allen ("Gaymon/Allen").[1] The Commonwealth's theory of the case was that Appellant shot Gaymon/Allen at the behest of Appellant's friend Kareem Glass, also known as "Gus" ("Glass/Gus"), because Gaymon/Allen had identified Glass/Gus as the individual responsible for the shooting death of Gaymon/Allen's

---

1. Appellant was also convicted of recklessly endangering another person and carrying a firearm on a public street. 18 Pa.C.S. §§ 2705 and 6108, respectively. There is some confusion in the record with regard to a third charge, criminal conspiracy, 18 Pa.C.S. § 903. As recorded in the notes of testimony, the jury foreperson announced in open court that the jury had found Appellant not guilty of criminal conspiracy. N.T., 9/18/07, at 51. However, just a little later, when the court crier summarized the jury's verdict, he included criminal conspiracy in the list of charges of which Appellant had been found guilty and the jury affirmed the crier's statement. Id. at 53. The verdict report, which was signed by the jury foreperson, indicates that Appellant was found guilty of all charges, including criminal conspiracy to shoot the victim. The trial court's sentencing order, dated 9/19/07, and the trial court opinion, dated 5/6/08, at 3, indicated that Appellant had been found guilty of, inter alia, murder and criminal conspiracy. The trial court imposed no further penalty for the criminal conspiracy charge. See Trial Court Order, dated 9/19/07; Court Commitment form, dated 9/19/07. It appears that the notes of testimony may have been transcribed incorrectly with regard to the criminal conspiracy verdict. No issue in this appeal involves the criminal conspiracy verdict.

cousin, Tyreek Gaymon, in 2004. In the penalty phase of Appellant's trial, the jury found two aggravating circumstances, *i.e.*, grave risk of death to another, and killing in retaliation against a witness, and one mitigating circumstance, *i.e.*, any other evidence, the "catchall mitigator." 42 Pa.C.S. §§ 9711(d)(7), (d)(15), and (e)(8), respectively. Determining that the aggravating circumstances outweighed the mitigating circumstances, the jury returned a sentence of death.

Appellant now appeals to this Court, pursuant to 42 Pa.C.S. § 9711(h)(1),[2] raising the following three issues for our review, which we set forth verbatim:

[1.] Did the prosecutor commit reversible misconduct in his closing argument at the first phase of the trial when he referred to the defense attorney in pejorative terms and effectively lumped him in with his client on the issue of killing a witness?

[2.] Did the court err in refusing to grant a defense request for an instruction on the "consciousness of innocence" even though the record supported such an instruction?

[3.] Did defense counsel provide ineffective assistance of counsel at the penalty stage when he started his closing argument by chastising and belligerently insulting the jury and in failing to present any forensic evidence to support an obvious attempt at mitigation based on serious trauma?

Appellant's Brief at 3 ("Statement of Questions Involved").

## SUFFICIENCY OF THE EVIDENCE

■ Before addressing Appellant's claims, we must independently review the legal sufficiency of the evidence to support his first-degree murder conviction, as we do in all cases in which a sentence of death has been imposed. *See, e.g., Commonwealth v. Briggs*, 608 Pa. 430, 12 A.3d 291, 306 (2011). In a sufficiency review, we determine whether the evidence presented at trial and all reasonable inferences de-

---

**2.** "A sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania pursuant to its rules." 42 Pa.C.S. § 9711(h)(1).

rived therefrom, viewed in the light most favorable to the Commonwealth as verdict-winner, are sufficient to establish all the elements of first-degree murder beyond a reasonable doubt. *Id.*

The elements of first-degree murder are as follows: (1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill. 18 Pa.C.S. § 2502(a); *Commonwealth v. Houser*, 610 Pa. 264, 18 A.3d 1128, 1133 (2011). First-degree murder is an intentional killing, *i.e.*, a "willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(a) and (d). Specific intent to kill as well as malice can be inferred from the use of a deadly weapon upon a vital part of the victim's body. *Houser, supra* at 1133–34; *Briggs, supra* at 306–307; *Commonwealth v. Wright*, 599 Pa. 270, 961 A.2d 119, 130–31 (2008). For example, in *Briggs, supra* at 307, we concluded that the appellant's deliberate and repeated use of a firearm to shoot the victims in the chest and/or abdomen established his specific intent to kill.

Here, our review of the testimony presented at trial shows that the evidence was sufficient to support a first-degree murder conviction. Dr. Edwin Lieberman, an assistant medical examiner who performed an autopsy on Gaymon/Allen, testified that the victim sustained four gunshot wounds, to the upper arm, abdomen, armpit, and left flank, respectively, the last of which caused damage to numerous internal organs including the heart. N.T., 9/12/07, at 5, 9, 13, 15, 18, 24, 30–31. Dr. Lieberman testified that the victim's death was the result of the multiple gunshot wounds. *Id.* at 34.

Several eyewitnesses to the shooting were standing on a street corner with a group of men, including the victim, when the shooting started on the opposite corner. Two of these eyewitnesses, Maurice Gaymon and Stanley Battle, cousins of the victim, testified that they observed Appellant walk down the street and then, upon reaching the corner, pull out a gun and fire multiple shots. N.T., 9/10/07, at 139–42, 198, 205–06;

N.T., 9/11/07, at 60–69. Both testified that they saw Appellant's "whole face." N.T., 9/10/07, at 142; N.T., 9/11/07, at 69. Mr. Battle testified that he was "just staring at [Appellant]" as Appellant was shooting, and that Appellant was shooting at the victim, firing a total of approximately twelve to fifteen shots. N.T., 9/11/07, at 66, 69, 73, 77. After the shooting stopped, both of these witnesses saw the victim lying on the ground. N.T., 9/10/07, at 156–57; N.T., 9/11/07, at 78. Subsequently, both witnesses identified Appellant in a police photo array as the assailant, and they also identified Appellant in court. N.T., 9/10/07, at 139, 167–69; N.T., 9/11/07, at 63, 85–88.

Malik Adams, who at the time of the murder was a 15–year-old friend of the victim, was also present at the murder scene. He gave a statement to police, identified Appellant in a police photo array as the assailant, and testified for the Commonwealth at Appellant's preliminary hearing. N.T., 9/13/07, at 54, 56, 61–62, 74–75, 85. In Adams's statement, he told police that Appellant was the only one at the scene with a gun, that Appellant was the only one shooting at the victim, and that Appellant was the individual whom he saw in the passenger seat of a black car that drove by the street corner shortly before the shooting. *Id.* at 190–91. During the June 13, 2006 preliminary hearing, Adams identified Appellant in court as the individual who had chased and shot the victim. *Id.* at 211–12.

However, when the Commonwealth called Adams as a witness at Appellant's trial, he declined to identify Appellant in court as the individual who had killed the victim, and he repudiated his prior identification of Appellant, his statement to police, and his testimony at Appellant's preliminary hearing, saying that he did not remember those events. *Id.* at 61–91. Although Adams identified the signature on his statement and on the photo array as his signature, he claimed not to know how it got there. *Id.* at 56–60, 70–80. Adams's statement and preliminary hearing testimony were read into the record at trial. *Id.* at 183–92, 207–49.

Another witness, Samuel Taylor, had known Appellant for many years and was in prison with him following the victim's murder. N.T., 9/12/07, at 154–56. While they were in prison together, Taylor testified, Appellant told him that he had murdered someone for a friend of his named "Gus" because the victim was going to testify at Gus's upcoming murder trial. *Id.* at 157–58. In addition, Appellant asked Taylor for a "favor," to wit, to kill the cousin of a witness against Appellant. To this end, Appellant gave Taylor the phone number of his girlfriend. *Id.* at 158–59; *see* N.T., 9/14/07, at 59.

Consistent with Taylor's testimony, other evidence showed that Appellant had visited Glass/Gus in prison on two dates, October 5, 2005, and January 31, 2006, the latter date being only three days before the murder. N.T., 9/12/07, at 57–58. When Appellant was arrested on April 19, 2006, he acknowledged, in his statement to police, that he had visited Glass/Gus in prison several times, including on January 31, 2006, and that he had purchased a cell phone for Glass/Gus. *Id.* at 96–97, 107–08, 110. Appellant also acknowledged in his statement that Glass/Gus "was worried about his upcoming court case and the witness going [sic] to testify against him," but Appellant denied that Glass/Gus had asked him to do anything about the witness and he denied knowledge of or involvement in the death of Gaymon/Allen. *Id.* at 110–12, 114.

Appellant advanced an innocence defense, centered on the testimony of Tamika McMurren, his girlfriend and mother of three of his children, who claimed that Appellant was unable to run or to use his right hand because of debilitating gunshot wounds that he had suffered in August 2003 and October 2005. N.T., 9/14/07, at 15–18, 30–31, 34, 39–42. McMurren testified that Appellant was unable to fire a gun or to light a cigarette with his right hand, although there was nothing wrong with his left hand. *Id.* at 39–40. Appellant's gunshot injuries had required surgery, and the surgeon who had operated on Appellant's right arm on October 31, 2005, testified for the Commonwealth after Ms. McMurren's testimony. N.T., 9/17/07, at 23 *et seq.* Specifically, the surgeon testified that Appellant had use of his right hand two days after the

surgery, and he would not have expected that ability to change. *Id.* at 39. The record indicated only a single post-surgical visit approximately a week after Appellant's surgery, so the surgeon was unable to provide any further information as to Appellant's subsequent ability to use his right hand. *Id.* at 36–38.

This evidence is sufficient to establish that Appellant shot and killed Gaymon/Allen with malice and with specific intent to kill. The evidence showed that Appellant chased the victim, repeatedly fired a gun at the victim, and with at least one bullet, struck the victim in a vital part of his body. We now turn to Appellant's specific claims.

## PROSECUTORIAL MISCONDUCT

■ In Appellant's first issue, he claims prosecutorial misconduct with respect to two portions of the Commonwealth's guilt-phase closing argument. In both instances, the defense made a contemporaneous objection, which the trial court did not grant. We review the trial court's rulings for abuse of discretion. *Commonwealth v. Chamberlain*, 612 Pa. 107, 30 A.3d 381, 408 (2011).

■ The legal principles relevant to a claim of prosecutorial misconduct are well established.

Comments by a prosecutor constitute reversible error only where their unavoidable effect is to prejudice the jury, forming in [the jurors'] minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a fair verdict.

*Commonwealth v. Hutchinson*, 611 Pa. 280, 25 A.3d 277, 307 (2011) (citation omitted).

■ While it is improper for a prosecutor to offer any personal opinion as to the guilt of the defendant or the credibility of the witnesses, it is entirely proper for the prosecutor to summarize the evidence presented, to offer reasonable deductions and inferences from the evidence, and to argue that the evidence establishes the defendant's guilt. *Id.* at 306–07; *Chamberlain, supra* at 408. In addition, the

prosecutor must be allowed to respond to defense counsel's arguments, and any challenged statement must be viewed not in isolation, but in the context in which it was offered. *Hutchinson, supra* at 307. "[The] prosecutor must be free to present his or her arguments with logical force and vigor," and comments representing mere oratorical flair are not objectionable. *Id.* at 306–07 (citation omitted).

The first comment of which Appellant complains concerns the credibility of those Commonwealth witnesses who were acknowledged drug dealers. Set in proper context, the comment is as follows.

Prosecutor: The judge will never tell you that, because you're a drug dealer, you cannot be believed. The law is not that because you've committed crimes in the past you cannot be believed, and [defense counsel] knows that. That's not the status of the law at all.

The status of the law is you take those witnesses in the chair and you see what they have to say, see whether what they have to say makes sense. In other words, and pardon me, because I know what [defense counsel] is trying to do is shoot the messenger; right? Shoot the messenger.

*Defense Counsel:* Objection.

*Prosecutor:* Would it be surprising he'd want to do that? I mean, what is this case about? It's about the killing of a witness.

N.T., 9/17/07, at 117–18; see Appellant's Brief at 10 (quoting and challenging the prosecutor's second and third paragraphs set forth above).

Appellant contends that the prosecutor's remark constituted a "degrading comment," "the unavoidable effect [of which] was to suggest to the jury that the defense attorney was trying to emulate the crime for which his client was charged, i.e.[,] killing a witness." Appellant's Brief at 11. In response, the Commonwealth argues that the prosecutor's comments constituted an apt and reasonable response to defense counsel's repeated attempts to undermine the credibility of the Commonwealth's witnesses. Commonwealth's Brief at 9–10. The

trial court concluded that the prosecutor's comment did not prejudice the jury and did not deny Appellant a fair trial. Trial Court Opinion, dated 5/6/08, at 9.

We conclude that the trial court did not abuse its discretion in declining to grant defense counsel's objection to the above-quoted comments. As argued by the Commonwealth, there is no question that the prosecutor was responding to defense counsel's strenuous verbal attack on the credibility of the Commonwealth's witnesses, several of whom were self-acknowledged drug dealers who had been convicted of numerous offenses.[3] The prosecutor was emphasizing to the jurors that *their* determinations as to credibility were controlling, and he was urging the jurors not to dismiss the witnesses' testimony merely on the basis of the witnesses' prior illegal conduct. This is entirely proper and consistent with prevailing law. We recognize that the prosecutor's use of the colloquial expression "shoot the messenger" was not a complete or particularly articulate way to convey these messages. Furthermore, the prosecutor's comparison between defense counsel "shooting the messenger" and Appellant killing a witness was inappropriate, irrelevant, and beyond the bounds of proper prosecutorial advocacy. Nonetheless, we discern no possibility that the prosecutor's brief albeit unsavory comparison, which was directed at defense counsel, not Appellant, could have prejudiced the jury toward Appellant such that the jurors were unable to weigh the evidence objectively and render a fair verdict.

In Appellant's second claim of prosecutorial misconduct, he contends that the prosecutor suggested that the defense had an obligation to present evidence and attempted to shift the burden of proof to the defense. Appellant's Brief at 9, 11. The background to this claim is as follows.

3. Defense counsel's closing argument included the following statement about the credibility of the Commonwealth's witnesses:
> [T]he unreliability of the witnesses all [sic] have criminal records. You are what you have been, ladies and gentlemen. They are tainted creatures, people who could not and is not [sic] and must not be believed, unreliable in every fashion.

N.T., 9/17/07, at 88.

After his arrest and throughout trial, Appellant maintained his innocence, specifically claiming that he could not even fire a gun with his right hand because of debilitating gunshot wounds that he had suffered in August 2003 and October 2005. In his post-arrest statement to police, which was read into evidence at trial, Appellant claimed that he had tried to hold a gun in his right hand and pull the trigger, but was unable to do so. N.T., 9/12/07, at 112. At trial, Ms. McMurren, Appellant's girlfriend and mother of three of his children, testified that Appellant was unable either to run or to use his right hand to fire a gun or to light a cigarette because of his injuries. N.T., 9/14/07, at 15–18, 30–31, 34, 39–42. The obvious implication of and desired inference to be drawn from these claims was clear: Appellant could not have been the assailant because he was not capable of giving chase and was not capable of firing a gun.

In closing argument, defense counsel raised Ms. McMurren's testimony as one of the reasons why the jurors should find reasonable doubt and acquit Appellant. *See* N.T., 9/17/07, at 86–89. In response, *see id.* at 155–60, the prosecutor questioned the credibility of Ms. McMurren's testimony and also commented on the lack of medical or lay corroboration of Appellant's alleged disabilities, as follows.

*Prosecutor:* Another thing about Ms. McMurren, when I asked, does your mom know about [Appellant's] limp? So-and-so this stuff with the hand and the limp? If this was such strong evidence and, again, they're not required to produce any evidence. I think we all understand this. The burden is on me. They're not required to do anything. *But had they had to put evidence on the stand, same Rules of Evidence apply, which means you got to look for corroboration. If this stuff about his arm and leg were true, wouldn't there be one medical professional who could back it up or how about his own mom? Or his sister or somebody else besides Tamika [McMurren] who we already know is visiting Kareem Glass in prison?*

*Defense Counsel:* Objection to all of this and move for a mistrial.

*The Court:* Jury, I have to again repeat every time there is an objection. It is your recollection of the evidence that will control your deliberations, not [what] counsel assumes that you ought to know or what he argues.

*Defense Counsel:* We're talking about shifting the burden, Your Honor, that's the difference.

*The Court:* The burden of proof will be described to you in my charge to you. I've already said it to you many times that the burden of proof is on the Commonwealth and it never shifts to the defense. You may proceed. Mistrial denied by the way.

*Id.* at 157–59 (closing argument) (emphasized portion quoted and challenged in Appellant's Brief at 11).

■ Appellant focuses on that portion of the prosecutor's closing argument emphasized in the excerpt quoted above, contending that the prosecutor attempted to shift the burden of proof to the defense by suggesting that the defense had an obligation to present evidence, an obligation that it had failed to meet. Appellant's Brief at 9, 11. In response, the Commonwealth argues that it was entitled to respond to the defense closing argument concerning Appellant's alleged infirmities. Commonwealth's Brief at 11. In denying Appellant's claim, the trial court noted that it had given detailed instructions to the jury regarding the burden of proof and had thoroughly explained that Appellant, as the defendant, was not required to present any evidence. Trial Court Opinion at 9. The trial court also concluded that the prosecutor's remarks had not prejudiced the jury and had not denied Appellant a fair trial. *Id.*

From our review of the record, particularly the context and background of the challenged remarks, as set forth above, we conclude that the trial court's ruling did not constitute an abuse of discretion. It is well-established that the prosecution is permitted to respond to arguments made by the defense. *See, e.g., Hutchinson, supra* at 307; *Commonwealth v. Tedford,* 598 Pa. 639, 960 A.2d 1, 33 (2008); *Commonwealth v. Carson,* 590 Pa. 501, 913 A.2d 220, 237, 239–40 (2006); *Com-*

monwealth v. Brown, 489 Pa. 285, 414 A.2d 70, 78 n. 6 (1980) ("It is clear that the prosecution may, in its closing address, attempt to meet the pleas and arguments made by defense counsel in his summation."). Here, the prosecutor was properly responding to the defense's argument that Appellant was physically incapable of having been the assailant. See id. at 155–60.

Appellant's assertion that the prosecutor attempted to shift the burden of proof to the defense is meritless. As illustrated in the above-quoted portion of the notes of testimony, the prosecutor expressly stated that the defense was not required to produce any evidence and that the burden of proof rested with the Commonwealth. The court immediately reiterated those principles to the jury. Although the defense was not required to proffer any evidence, the defense here chose to do so, in the form of Ms. McMurren's testimony as to the allegedly lingering effects of Appellant's prior injury to his right hand. In response, the prosecutor did not attempt to shift the burden of proof to the defense, but rather questioned the credibility of the defense witness; highlighted her potential bias; and pointed out, albeit inartfully, the lack of any corroboration of Appellant's alleged physical disability. The prosecutor acted well within the bounds of proper advocacy in thus suggesting possible weaknesses regarding the defense's proffered evidence. Accordingly, the trial court did not abuse its discretion in declining to grant Appellant's objection.

In sum, we conclude that there is no merit to either of Appellant's claims of prosecutorial misconduct.

## "CONSCIOUSNESS OF INNOCENCE" INSTRUCTION

In Appellant's second issue, he claims that the trial court erred by not giving a "consciousness of innocence" instruction to the jury. Appellant's Brief at 12. The background to this claim is as follows. Near the end of Appellant's trial, the Commonwealth requested a consciousness of guilt jury charge based on Samuel Taylor's testimony that Appellant had asked him to kill a cousin of one of the witnesses in the instant case.

N.T., 9/18/07, at 3 (chambers conference); N.T., 9/12/07, at 158–59 (Taylor's trial testimony). Defense counsel objected to the requested charge, and the trial court overruled the objection. N.T., 9/18/07, at 3–4. Defense counsel then requested a "consciousness of innocence" charge "[i]n order to make sure the playing field is equal." *Id.* at 5. Defense counsel explained the requested charge as follows: "an individual who voluntarily speaks to the police officers and gives them information is evidence tending to show that he's not guilty of the particular charges." *Id.* The trial court denied the defense request after the Commonwealth pointed out that there is no standard jury charge as to consciousness of innocence and no appellate law on the matter. *Id.; see also* Trial Court Opinion at 10 (explaining that a consciousness of innocence charge was not given because "there is no precedent or procedural rule to warrant such a charge"). In the court's charge to the jury, neither a consciousness of innocence nor a consciousness of guilt instruction was included.

Before this Court, Appellant argues that the trial court erred by not giving a consciousness of innocence instruction, although he provides no legal support for the propriety of such a charge. Appellant's Brief at 12–14. Appellant characterizes a consciousness of innocence instruction as a "corollary" to a consciousness of guilt instruction, and asserts that "the defense had the same right to have [the jurors] instructed on [the possibility that Appellant was conscious of his innocence and was trying to be helpful] as the Commonwealth had to have [the jurors] consider consciousness of guilt." *Id.* at 13–14. As factual support for the appropriateness of a consciousness of innocence instruction in this case, Appellant cites his post-arrest cooperation with the police, including the statement he gave in custody, in which he denied killing Gaymon/Allen. *Id.* at 13. The Commonwealth responds that the trial court correctly declined to give an instruction that was supported neither by prevailing law nor by the facts of the case.

The question of a "consciousness of innocence" jury instruction has not been previously addressed by this Court. Howev-

er, the Superior Court has considered and rejected a similar instruction, an "absence of flight" instruction. *See Commonwealth v. Hanford,* 937 A.2d 1094, 1097–98 (Pa.Super.2007). In *Hanford,* the defendant claimed that the trial court had erred by denying his request for an "absence of flight" instruction, pursuant to which the trial court would instruct the jury that it could infer innocence from the defendant's failure to flee the scene of his alleged offense or to attempt to elude capture by the police. Recognizing the issue as one of first impression in Pennsylvania, the Superior Court panel held that the defendant-appellant's claim was meritless. *Id.* at 1097–98. The panel reasoned that a suspect's failure to attempt to avoid the police was "open to multiple interpretations, many of which have little to do with consciousness of guilt, [but] could actually reflect a strategic choice." *Id.* at 1097. In addition, the panel concluded that an "absence of flight" instruction was unnecessary because a defendant is presumed innocent until proven guilty and the jury is so instructed; therefore, the jury need not be additionally charged on an inference of innocence from the failure to flee from police. *Id.* at 1097–98.

Many other jurisdictions have reached conclusions similar to that of our Superior Court in *Hanford.* For example, the Connecticut Appellate Court has consistently declined to require a consciousness of innocence instruction based on a defendant's voluntary surrender to police or failure to flee from police. In *State v. Timmons,* 7 Conn.App. 457, 509 A.2d 64, 70 (1986), the defendant had sought a consciousness of innocence instruction based on his voluntary surrender to police. In rejecting the defendant-appellant's claim, the appellate court held as follows:

The surrender of an accused is a factual argument that may properly be made to a jury in summation of the evidence. It is not a theory of defense from which, as a matter of law, an inference of innocence may be drawn by the jury. This court has been unable to find any authority allowing an

instruction permitting the jury to infer innocence from surrender after flight.

*Id.* at 70.

The Connecticut Appellate Court subsequently relied on *Timmons* to reach the same conclusion in *State v. Holley,* 90 Conn.App. 350, 877 A.2d 872, 879–82 (2005), where the defendant had sought a consciousness of innocence instruction based on his voluntary appearance at police headquarters and statement to police after the crime. Similarly, in *State v. Jennings,* 19 Conn.App. 265, 562 A.2d 545, 548–49 (1989), the same court determined that there was no support in law for the defendant's requested consciousness of innocence instruction based on his failure to attempt escape upon being approached by police officers after the crime.

The Massachusetts Supreme Court reached the same conclusion as the Connecticut Appellate Court in two cases in which the defendant had sought a consciousness of innocence instruction based on his voluntary appearance at the police station. In *Commonwealth v. Pina,* 430 Mass. 266, 717 N.E.2d 1005, 1012 (1999), the Massachusetts Supreme Court held as follows:

We hold that consciousness of innocence is a subject properly left to the give and take of argument, without jury instructions. A judge does not err, or abuse discretion, by refusing to give a consciousness of innocence instruction.

*Id.* at 1012 (quotation marks and internal citation omitted).

In *Commonwealth v. Lam,* 420 Mass. 615, 650 N.E.2d 796, 799 (1995), the Massachusetts Supreme Court reached the same holding and also explained the difficulties inherent in evidence proffered to show consciousness of innocence, determining that such evidence "is of little value because there are many reasons why a guilty person might refrain from flight," including a belief that the police did not have sufficient evidence to implicate him in the crime.

In *People v. Staten,* 24 Cal.4th 434, 101 Cal.Rptr.2d 213, 11 P.3d 968, 984 (2000), the California Supreme Court reiterated that a defendant did not have any right to a jury instruction

that absence of flight may be considered as a factor tending to show innocence. The California penal code requires that, when the prosecution relies on evidence of the defendant's flight as tending to show consciousness of guilt, the jury must be instructed that it may consider such evidence when deciding its verdict; however, in *Staten,* the California Supreme Court concluded that a defendant had no right to a "reciprocal," consciousness of innocence instruction based on evidence of the defendant's absence of flight. *Id.* (citing *People v. Green,* 27 Cal.3d 1, 164 Cal.Rptr. 1, 609 P.2d 468 (1980); *People v. Williams,* 55 Cal.App.4th 648, 64 Cal.Rptr.2d 203 (1997)). In *Green, supra* at 490–91, a case presenting a similar issue, the California Supreme Court concluded that a defendant's absence of flight, whether pre-or post-arrest, "is so ambiguous, so laden with conflicting interpretations, that its probative value on the issue of innocence is slight." *Id.* at 490–91.

Other jurisdictions have considered the issue of a consciousness of innocence instruction, and uniformly have concluded that a defendant is not entitled to such an instruction. *See e.g., Hanford,* 937 A.2d at 1097 (listing cases in which the issue of a consciousness of innocence instruction has been addressed and rejected); *Jennings,* 562 A.2d at 549 n. 3 (same); *Smith v. U.S.,* 837 A.2d 87, 100 (D.C.2003) (concluding that the trial court did not err in refusing to give an absence of flight instruction because legal authority did not support, but rather refuted, such an instruction); *State v. Sorensen,* 104 Ariz. 503, 455 P.2d 981, 987 (1969) (discerning no prejudice to the defendant in the trial court's refusal to give an instruction as to absence of flight, and concluding that the matter is "more properly one of argument").

We are persuaded by the reasoning of the courts in our sister states, as well as our own Superior Court, and, accordingly, we decline to hold that a consciousness of innocence jury instruction would have been proper here.[4] The matter is

4. Whether a consciousness of innocence instruction might ever be appropriate under the factual circumstances of a particular case, we leave at present to the sound discretion of the trial courts.

properly one of argument to the jury.[5]  There is no merit to Appellant's second issue.

5.  We feel compelled to comment that the evidence upon which Appellant relies to support his consciousness of innocence claim is hardly favorable to his assertion of innocence.  Appellant maintains that he "cooperated with the police and freely gave a statement in which he denied being the killer but explained other aspects related to the inquiry."  Appellant's Brief at 13.  Appellant has ignored most of information in his statement, as we explain below.

Appellant's "cooperation" with the police occurred and his statement was given after Appellant was arrested, two months after the murder. Appellant's statement, which was proffered by the Commonwealth and read into evidence by the investigating officer, was in the form of Appellant's answers to specific questions asked by the officer.  N.T., 9/12/07, at 96–97, 104–05.  As entered into evidence at trial, Appellant's statement contained the following information.  In response to the officer's question regarding whether Appellant frequented a particular neighborhood, Appellant said yes and then volunteered that he had met Kareem Glass/Gus in 2000; the officer had not mentioned the name Glass/Gus up to that point in the interview.  *Id.* at 107.  Appellant declined to say who had shot him several months prior to Gaymon/Allen's murder.  *Id.* Appellant acknowledged that, three days before the murder of Gaymon/Allen, Appellant had visited Glass/Gus in prison with an individual known as "Wanted."  *Id.* at 108.  Appellant identified "Wanted" as a friend of Glass/Gus, whom Appellant had met on the day of the prison visit, apparently because Glass/Gus thought that Appellant and "Wanted" should get to know each other.  *Id.* at 108–10. As to what "Wanted," Glass/Gus, and Appellant discussed during the prison visit, Appellant stated that Glass/Gus "was worried about his upcoming court case and the witness going [sic] to testify against him." *Id.* at 110.  In addition, Appellant stated that he had purchased a cell phone for Glass/Gus, at the latter's request, and had given it to a guard to deliver to Glass/Gus.  *Id.* When the officer inquired about Appellant's use of his right hand, Appellant responded as follows: "[M]y hand ain't right yet.  I can't even fire a gun from my hand.  I tried to hold a gun in my right hand and pull the trigger but my right hand isn't ready for it yet."  *Id.* at 112.  Appellant denied that Glass/Gus had asked him to speak with or do anything about the witness who was going to testify against Glass/Gus, he denied having a gun at the time of the murder, and he denied shooting the victim.  *Id.* at 112–13.  Appellant refused to consent to a videotaped statement or a recording of an interview with the officer.  *Id.* at 116–17.  Following Appellant's statement to police, a cell phone was recovered from Glass/Gus's prison cell.  On February 3, 2006, the day of Gaymon/Allen's murder, there were 118 calls dialed out from or received on this phone.  *Id.* at 121.

We fail to see how Appellant's "[explanation of] other aspects related to the [police] inquiry" into Gaymon/Allen's murder can possibly support an inference of innocence.

## INEFFECTIVE ASSISTANCE OF COUNSEL

In Appellant's third and final issue, he sets forth two claims of ineffective assistance of counsel during the penalty phase. Appellant's Brief at 14. In the first claim, Appellant contends that defense counsel insulted the jurors during his closing argument by telling them that their guilt-phase verdict was rendered so swiftly that they had had no time to deliberate, to think, or to talk about it. *Id.* at 15–16 (citing N.T., 9/19/07, at 60–61). In his second claim, Appellant asserts that the mitigation evidence presented by defense counsel was inadequate because no expert witnesses or forensic evaluations were proffered to establish Appellant's "physical[,] emotional, and psychological impairments" caused by the "terrible physical calamities" that he had experienced. *Id.* at 16–17. In particular, Appellant cites "the number of times that he had been shot and actually died, only to be revived and brought back to life." *Id.* at 16. The trial court found no merit to either of these claims, addressing each only in a very brief, general, and cursory manner in its opinion. Trial Court Opinion at 12–14.

In *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726, 738 (2002), this Court held that claims of ineffective assistance of counsel are to be deferred until collateral review, pursuant to the Post Conviction Relief Act (PCRA).[6] Appellant recognizes the general rule announced in *Grant,* but asserts that an "exception" to the *Grant* rule, allegedly set forth in *Commonwealth v. Bomar,* 573 Pa. 426, 826 A.2d 831, 854–55 (2003), should be applied here for two reasons: defense counsel's challenged conduct "appears on the face of the record" and the trial court addressed the ineffectiveness claims in its opinion. Appellant's Brief at 15. Appellant is mistaken.

Even if we were to assume that *Bomar*'s holding can be properly characterized as an exception to *Grant*'s general rule, *Bomar* is distinguishable both legally and factually from the instant case.[7] The direct appeal in *Bomar* was pending in

6. 42 Pa.C.S. § 9541 *et seq.*

7. Pending before this Court is *Commonwealth v. Holmes,* No. 40 MAP 2010, in which this Court has accepted for review the issue of whether

2002 when *Grant* was decided. In *Bomar,* the appellant obtained new counsel right after sentencing, and, consistent with prevailing law at the time, he filed post-sentence motions raising, inter alia, several claims of ineffective assistance of trial counsel. *Bomar, supra* at 853. The trial court conducted hearings on the post-sentence motions at which trial counsel testified; the trial court then addressed and resolved the ineffectiveness claims in its opinion. *Id.* Thus, because the trial court had developed an extensive record concerning trial counsel's actions, rationales, and strategies, there was no danger of appellate fact-finding or speculation. *Id.* at 854.

None of the circumstances that led this Court to address the *Bomar* appellant's ineffectiveness claims on direct appeal are present in the instant case. Here, Appellant's trial was in 2007, nearly five years after *Grant* was decided. Appellant included his ineffectiveness claims in his Statement of Matters Complained of on Appeal, pursuant to Pa.R.A.P.1925(b), but there was absolutely no development of the claims with a hearing, testimony of trial counsel, or proffer of other evidence. Thus, there is no record upon which to base any determination as to trial counsel's strategy or rationale. The trial court cursorily concluded that Appellant's ineffectiveness claims had no merit; however, the trial court provided little or no analysis of the claims in the context of the prevailing legal standard. *See Bomar, supra* at 855 (citing *Commonwealth v. Pierce,* 567 Pa. 186, 786 A.2d 203, 213 (2001)). The general rule of *Grant* applies to Appellant's ineffectiveness claims, and we dismiss them, without prejudice, to be raised on collateral review.

Finally, pursuant to 42 Pa.C.S. § 9711(h)(3), we must review a sentence of death and affirm, unless we determine that

claims of ineffective assistance of counsel in a nunc pro tunc direct appeal: (1) are reviewable on direct appeal under *Commonwealth v. Bomar;* (2) should instead be deferred to collateral review under the general rule in *Commonwealth v. Grant;* or (3) should instead be deemed reviewable on direct appeal only if accompanied by a specific waiver of the right to pursue a first PCRA petition as of right. *Commonwealth v. Holmes,* 606 Pa. 209, 996 A.2d 479 (2010).

> (i) the sentence of death was the product of passion, prejudice or any other arbitrary factor; or
>
> (ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d).

42 Pa.C.S 9711(h)(3).

Following review of the facts and the record, we conclude that the sentence of death was not the result of "passion, prejudice, or any other arbitrary factor," but rather was based on the Commonwealth's evidence admitted at trial. *Id.* In addition, we conclude that the evidence admitted at trial was sufficient "to support the finding of at least one aggravating circumstance." *Id.* The verdict and sentence of death are hereby affirmed.[8]

Justice ORIE MELVIN did not participate in the decision of this case.

Chief Justice CASTILLE, Justices EAKIN, BAER and TODD join the opinion.

Justice SAYLOR files a concurring opinion.

Justice SAYLOR, concurring.

I join the majority opinion, except the discussion of the prosecutor's "shoot the messenger" remark. *See* Majority Opinion at 80, 54 A.3d at 338–39. In my judgment, the trial court erred in failing to sustain the defense objection. I agree with the majority that the prosecutor's follow-up commentary was inappropriate as well, and with the majority's assessment in terms of impact on the verdict. *See id.*

---

**8.** The Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor of Pennsylvania. *See* 42 Pa.C.S. § 9711(i).