J-S37022-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSHUA J. YELVERTON | : | |
| | : | |
| Appellant | : | No. 2030 EDA 2021 |

Appeal from the Judgment of Sentence Entered August 6, 2021
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0002143-2020

BEFORE:  BOWES, J., LAZARUS, J., and OLSON, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED DECEMBER 16, 2022**

Joshua J. Yelverton appeals from the judgment of sentence, entered in the Court of Common Pleas of Philadelphia County, following his convictions of third-degree murder,[1] conspiracy – third-degree murder,[2] possessing instruments of crime (PIC),[3] firearms not to be carried without a license,[4] and carrying firearms on public streets or public property in Philadelphia.[5]  After review, we affirm.

---

[1] 18 Pa.C.S.A. § 2502(c).

[2] *Id.* at § 903.

[3] *Id.* at § 907(a).

[4] *Id.* at § 6106(a)(1).

[5] *Id.* at § 6108.

On October 31, 2019, at approximately 4:45 p.m., Yelverton and Marquis Mathis arrived at the Regency Apartments Complex at 5600 Ogontz Avenue in Philadelphia. For forty-five minutes, Yelverton and Marquis walked around the complex, entered and exited several apartment buildings, and ultimately stopped in the large courtyard.[6]

At 5:30 p.m., while Yelverton and Mathis stood in the large courtyard, a man wearing a clown mask, Carter, approached Mathis. Yelverton was hidden behind a wall. Carter had a brief exchange with Mathis, after which Yelverton pulled out his gun, a .45 caliber firearm with an extended magazine.[7] At the same time, Mathis also pulled out his firearm. Carter pulled out his own firearm and, within seconds, all three men began shooting.

Yelverton remained hidden behind the wall while he shot at Carter. Mathis, likewise, shot at Carter. Carter's gun, after firing a single bullet, was struck in the baseplate, which broke the gun into multiple pieces and caused all the bullets, except for one, to fall out of the damaged gun. Carter attempted to run, but was struck by multiple bullets. Carter collapsed almost immediately, facing away from Mathis and Yelverton. As Carter fell, his damaged firearm fell from his hand and landed several feet away from him.

---

[6] Yelverton and Mathis's arrival at the apartment complex, their walk through the complex, and the subsequent murder of Craig Carter Jr. was captured on surveillance video and presented at trial.

[7] Yelverton did not have a license to carry a firearm.

After Carter collapsed, the shooting momentarily paused and Mathis put his firearm away. Yelverton walked out from behind the wall and continued to fire at Carter, who was unarmed and lying on the ground. Yelverton and Mathis began to run away, but Yelverton stopped and fired at Carter again. Yelverton and Mathis fled the scene together and disposed of their firearms under the same car.

Police from the 35th Philadelphia Police District heard gunshots and responded to the scene. Police recovered twenty-one .45 caliber fired cartridge casings (FCCs), four .357 caliber FCCs,[8] one 9mm FCC, eight 9mm live cartridges, one 9mm handgun with the magazine missing the bottom plate, a clown mask, and one pair of earbuds. Police transported Carter to Albert Einstein Hospital, where he was pronounced dead.

Doctor Albert Chu, Deputy Medical Examiner, recovered eleven projectiles from Carter's body. Ten projectiles were .45 caliber rounds fired from Yelverton's gun. One projectile was inconclusive. Carter was shot fourteen times in total.

Yelverton was identified from the apartment complex surveillance video. However, after the shooting, Yelverton cut off his dreadlocks, avoided returning to his home, and evaded arrest for several months. Ultimately,

---

[8] Mathis's firearm was a .357 caliber handgun.

Yelverton was located, arrested, and interviewed.  Yelverton was **Mirandized**[9] and confessed to killing Carter.

Yelverton was charged and, on May 18, 2021, he proceeded to a non-jury trial, after which he was convicted of the above-mentioned offenses.  The trial court deferred sentencing for the preparation of a pre-sentence investigation and mental health reports.  On August 6, 2021, the trial court sentenced Yelverton to an aggregate term of 20 to 44 years in prison.  Yelverton filed a timely post-sentence motion, which was denied.  Yelverton filed a timely notice of appeal and a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

Yelverton now raises the following questions for our review:

[1.]  Was the evidence sufficient to convict [] Yelverton of third-degree murder, conspiracy to commit third-degree murder, and PIC, where the Commonwealth failed to disprove he acted in self-defense?

[2.]  Did the trial court commit reversible error when the court rejected [] Yelverton's imperfect self-defense theory and convicted him of third-degree murder, not voluntary manslaughter?

[3.]  Was the evidence sufficient to convict [] Yelverton of conspiracy, where the evidence did not prove beyond a reasonable doubt that he agreed with another person to engage in criminal conduct?

Brief for Appellant, at 7.

---

[9] **Miranda v. Arizona**, 384 U.S. 436 (1966).

- 4 -

When examining a challenge to the sufficiency of the evidence, we adhere to the following standard of review:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not [re-]weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that[,] as a matter of law[,] no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [trier] of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

*Commonwealth v. Smith*, 97 A.3d 782, 790 (Pa. Super. 2014) (citation omitted).

For ease of disposition, we address Yelverton's first two claims together. In his first claim, Yelverton argues that he raised a claim of self-defense at trial, which the Commonwealth failed to disprove beyond a reasonable doubt. *See* Brief for Appellant, at 15-21. In his second claim, Yelverton argues that even if he did not act in self-defense, he acted in imperfect self-defense and the trial court erred by not finding him guilty of voluntary manslaughter. *Id.* at 21-23. We disagree.

The Crimes Code defines third-degree murder as "[a]ll other kinds of murder" other than first and second-degree murder and classifies it as "a felony of the first degree." 18 Pa.C.S.A. § 2502(c). To sustain a conviction of third-degree murder, the Commonwealth must prove that the defendant killed another person with malice. **Commonwealth v. Hardy**, 918 A.2d 766, 774 (Pa. Super. 2007). Malice is defined as "exhibiting an 'extreme indifference to human life.'" **Commonwealth v. Ludwig**, 874 A.2d 623, 632 (Pa. 2005) (quoting **Commonwealth v. Young**, 431 A.2d 230, 232 (Pa. 1981)) (emphasis omitted). A fact-finder may find malice not only in an intentional killing, "but also in an unintentional homicide where the perpetrator consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily injury." **Ludwig**, 874 A.2d at 632 (quotation and citation omitted). A fact-finder may also infer malice "from the use of a deadly weapon upon a vital part of the victim's body." **Commonwealth v. Thomas**, 54 A.3d 332, 335-36 (Pa. 2012).

For the following reasons, we conclude that the Commonwealth presented sufficient evidence that disproved Yelverton's self-defense and imperfect self-defense claims. In particular, Yelverton provoked the incident by drawing his firearm first, and he escalated the use of force by firing 21 bullets at Carter, striking him at least 10 times, and continuing to fire after Carter had crumpled to the ground.

The use of force against a person is justified "when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force" by another person. 18 Pa.C.S.A. § 505(a). There is no burden on the defendant to prove a claim of self-defense, but there must be some evidence, from any source, to justify a finding of self-defense. *See Commonwealth v. Black*, 376 A.2d 627, 630 (Pa. 1977). If there is any evidence that will support the claim, then the issue is properly before the fact finder. *See Commonwealth v. Mayfield*, 585 A.2d 1069, 1071 (Pa. Super. 1991). "If a defendant introduces evidence of self-defense, the Commonwealth bears the burden of disproving the self-defense claim beyond a reasonable doubt." *Commonwealth v. Houser*, 18 A.3d 1128, 1135 (Pa. 2011).

The Commonwealth can disprove a claim of self-defense by establishing that "[1] the accused did not reasonably believe that he was in danger of death or serious bodily injury; or [2] the accused provoked or continued the use of force; or [3] the accused had a duty to retreat[,] and the retreat was possible with complete safety." *Smith*, 97 A.3d at 787. The Commonwealth must establish only one of these three elements beyond a reasonable doubt. *Commonwealth v. Burns*, 765 A.2d 1144, 1149 (Pa. Super. 2000).

The finder of fact is not required to believe the defendant's testimony that he thought that he was in imminent danger and acted in self-defense. *Commonwealth v. Houser*, 18 A.3d 1128, 1135 (Pa. 2011). Disbelief of the

defendant's testimony, however, is not sufficient to satisfy the Commonwealth's burden to disprove self-defense absent some evidence negating self-defense. *Commonwealth v. Ward*, 188 A.3d 1301, 1304 (Pa. Super. 2018).

In his second claim, Yelverton argues that even if he was not acting in self-defense, he was acting in imperfect self-defense and that the trial court erred in not finding him guilty of voluntary manslaughter. *See* Brief for Appellant, at 21-23.

The Crimes Code defines voluntary manslaughter as follows:

> (b) Unreasonable belief killing justifiable.--A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title, but his belief is unreasonable.

18 Pa.C.S.A. § 2503(b).

The defense of "imperfect self-defense," which reduces the crime of murder to voluntary manslaughter, exists where the defendant actually, but unreasonably, believed that deadly force was necessary to protect himself or another against the use of unlawful force. *See Commonwealth v. Truong*, 36 A.3d 592, 599 (Pa. Super. 2012). This defense applies only in limited circumstances. *See Commonwealth v. Green*, 273 A.3d 1080, 1087-88 (Pa. Super. 2022). This Court has recently stated:

> If the Commonwealth proves that the defendant's belief that deadly force was necessary was unreasonable but does not disprove that [] the defendant genuinely believed that he was in imminent danger that required deadly force and does not disprove

either of the other elements of self-defense, the defendant may be found guilty only of voluntary manslaughter under the defense of imperfect self-defense.

**See Commonwealth v. Jones**, 271 A.3d 452, 459 (Pa. Super. 2021).

Instantly, the record reveals that Carter, wearing a clown mask, approached Mathis. N.T. Non-Jury Trial, 5/18/21, at 75, 77-81, 90-96; **id.**, 5/19/21, at 15-28. Yelverton was hidden behind a wall and drew his firearm as Carter approached. **Id.** 5/18/21, at 89-93, 113-16; **id.**, 5/19/21, at 39, 58. Carter, Yelverton, and Mathis all had firearms. **Id.**, 5/18/21, at 93-94, 113-16; **id.**, 5/19/21, at 39, 53. While the record is unclear as to who fired first, it is clear that Carter fired one bullet, but Yelverton fired 21 bullets. **See id.**, 5/18/21, at 24-25, 37-38, 169-73, 204-05. Even though Carter had been struck, disarmed, and collapsed to the ground, Yelverton continued to fire at Carter. **Id.**, 5/18/21, at 55, 64, 95-96, 121-22; **id.**, 5/19/21, at 26-28, 75-82, 85-91.

Based upon the above facts, the Commonwealth disproved Yelverton's claim of self-defense beyond a reasonable doubt. **See Commonwealth v. Harvey**, 812 A.2d 1190, 1196 (Pa. 2002) (even assuming victim threatened defendant with deadly force before defendant shot him, "the autopsy report revealed that [the victim] had been shot a total of six times, which was simply more force than would have been necessary for the [the defendant] to use in order to protect himself"); **see also Commonwealth v. Rivera**, 983 A.2d 1211, 1222 n.10 (Pa. 2009) ("even if [a]ppellant believed that [the victim]

was pursuing him with a deadly weapon, the use of force employed by [a]ppellant was excessive in that he shot [the victim] a second time at close range after already having shot him in the chest, causing the victim to fall forward"). It is clear that Yelverton provoked the use of force by drawing his firearm first. Similarly, it is apparent that Yelverton escalated that force when he shot Carter, continued to shoot at him 21 times even after Carter had collapsed and been disarmed, and struck Carter with at least 10 of those shots. Meanwhile, Carter discharged a single round, which did not strike Yelverton. Therefore, we conclude the Commonwealth presented sufficient evidence to disprove Yelverton's self-defense claim. *See Smith*, *supra*; *see also Harvey*, *supra*. Accordingly, we grant him no relief.[10]

Yelverton's claim of imperfect self-defense fails for the same reasons as his claim of self-defense. Namely, Yelverton provoked the altercation by drawing his firearm first, and escalated the use of force by repeatedly firing

_____

[10] Moreover, we observe that after shooting Carter, Yelverton fled the scene with Mathis and both of them hid their firearms under the same vehicle. *See* N.T. Non-Jury Trial, 5/18/21, at 90-96; *id.*, 5/19/21, at 15-28, 39. Additionally, after fleeing the scene, Yelverton changed his appearance and evaded arrest for several months. *See* N.T. 5/18/21, at 16-18, 230-33; *id.*, 5/19/21, at 54, 91-96; *see also Commonwealth v. Hughes*, 865 A.2d 761, 792 (Pa. 2004) (conduct of defendant after crime may be admitted showing guilt); *Commonwealth v. Bradley*, 69 A.3d 253, 258-59 (Pa. Super. 2013) ("[D]efendant's attempts to cover up after a crime can be inferred to demonstrate consciousness of guilt."). Thus, Yelverton's flight and subsequent attempted concealment of his firearm undermine his claim of self-defense.

- 10 -

his weapon **even after** Carter had already been disarmed and collapsed on the ground. ***See Jones***, ***supra***. Accordingly, we grant Yelverton no relief.

In his third claim, Yelverton argues that the Commonwealth presented insufficient evidence to sustain his conviction of conspiracy. ***See*** Brief for Appellant, at 23-25. Yelverton contends that he was unaware that Mathis followed him away from the scene. ***Id.*** Additionally, Yelverton asserts that he did not intend to enter into a criminal conspiracy because the killing of Carter arose from "unexpected events." ***Id.*** at 23. Yelverton posits that he did not agree to commit a crime with Mathis, because Yelverton's intention was to defend himself from Carter. ***Id.*** at 23-24.

The Crimes Code defines conspiracy as follows:

(a) Definition of conspiracy.--A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

(1) agrees with such other person or persons that they or one of more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S.A. § 903(a).

Simplified, the offense of conspiracy requires proof of three elements: (1) an agreement, (2) shared criminal intent, and (3) an overt act. ***See Commonwealth v. Murphy***, 795 A.2d 1025, 1037-38 (Pa. Super. 2002). The "overt act need not be committed by the defendant; it need only be

- 11 -

committed by a co-conspirator." ***Commonwealth v. Hennigan***, 753 A.2d 245, 253 (Pa. Super. 2000).

"Mere association with the perpetrators, mere presence at the scene, or mere knowledge of the crime is insufficient to establish that a defendant was part of a conspiratorial agreement to commit the crime." ***Commonwealth v. Dunkins***, 229 A.3d 622, 633 (Pa. Super. 2020) (citation omitted). Generally, there must be some additional proof that a defendant intended to commit the crime along with the co-conspirator. ***Id.***

Instantly, the trial court addressed Yelverton's claim as follows:

[Yelverton] and Mathis arrived at the apartment complex together, spent approximately forty-five minutes in the apartment complex together, and waited in the courtyard together before the shooting. [Yelverton and Mathis] raised [their] weapon[s at Carter together.] [Yelverton] and Mathis began firing at [Carter] at the same time. They ran away from the scene of the murder together. As they fled, [Yelverton] and Mathis disposed of their weapons by tossing them under the same car. [Thus,] the Commonwealth presented ample evidence of an agreement to commit a crime between [Yelverton] and Mathis.

Trial Court Opinion, 11/5/21, at 5.

Based upon our review of the record, we agree with the trial court's determination and affirm on this basis. ***See id.*** We emphasize that Yelverton was not "merely" associating with Mathis, or merely present at the scene. ***See Dunkins***, ***supra***. Rather, Yelverton and Mathis arrived together, spent time together, aimed their firearms at Carter together, shot Carter together, fled the scene together, and hid their firearms under the same car. ***See*** Trial Court Opinion, 11/5/21, at 5. Thus, the Commonwealth presented sufficient

- 12 -

evidence to sustain Yelverton's conviction of conspiracy and we afford him no relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/16/2022