J-S68016-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MANUEL DEL ROSARIO GONZALEZ | |
| Appellant | No. 3070 EDA 2013 |

Appeal from the Judgment of Sentence October 8, 2013
In the Court of Common Pleas of Lehigh County
Criminal Division at No(s): CP-39-CR-0001329-2012

BEFORE:  ALLEN, J., JENKINS, J., and MUSMANNO, J.

MEMORANDUM BY JENKINS, J.:                    **FILED NOVEMBER 14, 2014**

Appellant, Manuel Del Rosario Gonzalez, appeals from the judgment of sentence entered in the Lehigh County Court of Common pleas, following his jury trial conviction for third degree murder.[1]  We affirm.

In its opinion, the trial court fully and correctly sets forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.

Appellant raises the following issues for our review:

> DID THE LOWER COURT MISTAKENLY DENY THE DEFENSE REQUEST FOR A MISTRIAL BASED UPON THE PROSECUTOR'S QUESTIONING AND STATEMENTS THAT BROUGHT INTO ISSUE THE DEFENDANT'S TESTIMONIAL SILENCE?

---

[1] 18 Pa.C.S. § 2502(c).

DID THE LOWER COURT ERR BY NOT GRANTING THE DEFENSE REQUEST FOR A MISTRIAL BASED UPON THE PROSECUTOR'S PREJUDICIAL STATEMENT ABOUT DEFENSE COUNSEL AND THE DEFENSE COUNSEL'S ROLE IN THE TRIAL?

DID THE TRIAL COURT, INAPPROPRIATELY AND PREJUDICIALLY, TAKE A POSITION OF ADVOCACY WHEN IT QUESTIONED THE DEFENDANT DURING THE COMMONWEALTH'S CROSS-EXAMINATION?

DID THE TRIAL COURT MISTAKENLY LIMIT THE DEFENSE COUNSEL'S CROSS-EXAMINATION OF VARIOUS COMMONWEALTH WITNESSES AS IT RELATED TO THEIR POSSIBLE GANG AFFILIATION?

(Appellant's Brief at 7-8).

Our standard of review of a court's denial of a motion for mistrial is as follows:

A motion for a mistrial is within the discretion of the trial court. A mistrial upon motion of one of the parties is required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial trial. It is within the trial court's discretion to determine whether a defendant was prejudiced by the incident that is the basis of a motion for a mistrial. On appeal, our standard of review is whether the trial court abused that discretion.

*Commonwealth v. Akbar*, 91 A.3d 227, 236 (Pa.Super.2014) (quoting

*Commonwealth v. Tejeda*, 834 A.2d 619, 623 (Pa.Super.2003). Further,

the admissibility of evidence is within the sound discretion of the trial court

and will be reversed only when there is an abuse of that discretion.

*Commonwealth v. Wantz*, 84 A.3d 324, 336 (Pa.Super.2014).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Lawrence J. Brenner, we conclude Appellant's issues merit no relief. The trial court opinion comprehensively discusses and properly disposes of the questions presented. (*See* Trial Court Opinion, filed December 11, 2013, at 6-22) (finding: Appellant, through his direct examination, opened the door to questions about his credibility on cross-examination, especially where Appellant outwardly acknowledged that he did not remain silent, but lied to police during the investigation; the prosecutor's statement about defense counsel's role in trial was a proper exhibit of oratorical flair, a proper cautionary instruction was issued to the jury that counsel did not attempt to mislead them with respect to testimony, and none of the prosecution's comments or questions posed to Appellant were improperly prejudicial such that they warranted a mistrial; Appellant's counsel did not object when the court questioned Appellant, thus waiving this issue for appellate review, and the court's questioning was proper to clarify Appellant's testimony; and evidence of alleged gang membership of two witnesses was properly excluded at trial as irrelevant without compromising Appellant's ability to make his argument to the jury regarding his fear for his safety). Accordingly, we affirm on the basis of the trial court's opinion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/14/2014

# IN THE COURT OF COMMON PLEAS OF LEHIGH COUNTY, PENNSYLVANIA

## CRIMINAL DIVISION

COMMONWEALTH
OF PENNSYLVANIA

     v.

MANUEL GONZALEZ,

     Appellant

No.   1329 of 2012

\* \* \* \* \* \* \* \* \*

Appearances:

     Craig W. Scheetz, Deputy District Attorney,
        on behalf of the Commonwealth

     Michael E. Brunnabend, Esquire,
        on behalf of the Appellant

\* \* \* \* \* \* \* \* \*

## LAWRENCE J. BRENNER, SENIOR JUDGE

### Pa.R.A.P. 1925(a) OPINION

Following a jury trial, the Appellant, Manuel Gonzalez, was convicted of murder in the third degree based on his shooting and killing Devon Robinson on October 22, 2011. Thereafter, this court sentenced Appellant to a term of imprisonment at a state correctional institution for a period of not less than 20 years to not more than 40 years. On October 18, 2013, Appellant filed the current notice of appeal to the Superior Court of Pennsylvania. In the appeal, Appellant raises four appellate issues. All of these issues relate to purported errors made by the court and the prosecution during trial. For the reasons that follow, all of Appellant's contentions lack merit and this appeal should be denied.

## Factual and Procedural History

On the night of October 21, 2011, Appellant was attending a social gathering at the residence of Darlene DeLeon, which is located near the intersection of Sixth and Gordon Streets in Allentown, Pennsylvania. Also attending this gathering were Manuel DeLaRosa (aka "Sencillo"), Ronald Diaz (aka "Mafia"), Eddie Herman (aka "Choko"), and Mario Nunez.

At some point that night, Manuel DeLaRosa and Mario Nunez became involved in an altercation in front of Ms. DeLeon's residence with Kareem Lomax and Anthony Santiago. DeLaRosa and Nunez then chased Lomax and Santiago several blocks on foot. During the chase, either DeLaRosa or Nunez fired gunshots in the direction of Lomax and Santiago. After the altercation, DeLaRosa and Nunez returned to Ms. DeLeon's residence. Thereafter, Appellant took possession of a handgun from Mario Nunez.

At some time later on the night of October 21, 2011, or in the early hours of October 22, 2011, Appellant, Manuel DeLaRosa, Ronald Diaz, Eddie Herman and Mario Nunez decided to leave that gathering at Ms. DeLeon's residence and drive to the south side of Allentown to attend another party and effectuate a sale of marijuana. Mario Nunez drove the men in the blue Acura automobile he owned.

Around 2:00 a.m. on the morning of October 22, before driving to the south side of Allentown, Mr. Nunez stopped at the Sunoco gas station and minimarket located at the intersection of 12th and Hamilton Streets in Allentown. Mr. Nunez stopped there to add gasoline to his automobile and to allow his passengers to purchase food and drinks at the minimarket.

2

While at the Sunoco parking lot, Appellant and his group encountered a group of approximately 30 to 40 people. Appellant recognized several people in this group as members of the "Bloods" street gang. This large group of people had just left a party at a nearby residence where the guests had been consuming alcohol. Included in this large group were Kareem Lomax and the victim in this case, Devon Robinson.

Kareem Lomax saw the Appellant and the two shook hands. Though not friends, Lomax and Appellant were acquaintances and knew each other from living in the same neighborhood around 5th and Gordon Streets in Allentown. Lomax also saw Manuel DeLaRosa and recognized him as one of the men who had chased him and fired gunshots in his direction a few hours earlier. Lomax confronted DeLaRosa and questioned him about the incident. As the two men argued, they were approached by Appellant, his group and the large group of people with which Lomax was associated. Several men in Lomax's group, including Nelson Soler, possessed guns. At one point, Soler pointed his gun in the direction of Appellant's group. During the argument, DeLaRosa denied any involvement in the earlier altercation, but smirked and snickered at Lomax. With this, Lomax threw a juice or iced tea he was holding at DeLaRosa and began to chase him through the parking lot. This action precipitated a brawl between Appellant's group and Lomax's group.

During the brawl, Appellant initially attempted to pacify the belligerents and end the fighting. However, Devon Robinson approached Appellant and punched him in the head, knocking him to the ground. This act was met with laughter from the Lomax group. Appellant then stood up and began to chase Robinson while brandishing a handgun. Mario Nunez joined Appellant in chasing after Robinson. During the chase, Appellant fired a

3

gunshot into the back of Robinson. Around the same time, Robinson and Appellant collided with an automobile attempting to back out of a parking spot and Robinson fell to the ground. Appellant was able to stay standing, but dropped his handgun. Nunez approached Robinson, who was still on the ground, and began to kick him in the face and chest. Appellant quickly retrieved his handgun, walked over to Robinson, stood over him and fired a gunshot into his head. Robinson died as a result of the initial gunshot into his back.

The entirety of the altercation described above was recorded on a wireless surveillance camera fixed at the intersection of 12th and Hamilton Streets by the Allentown Police Department.

After shooting Robinson, Appellant ran from the scene. Later on the morning of October 22, Appellant went to the residence of his girlfriend, Ambar Perez, located at 333 North Hall Street in Allentown. Appellant woke Ms. Perez and explained to her that he was in a fight and that he believed he may have badly hurt or killed someone. Ms. Perez was disturbed by this revelation and asked Appellant to leave her residence. Appellant complied and evaded authorities for approximately three and a half months.

Appellant ultimately returned to Ms. Perez's residence in February of 2012. On February 13, 2012, Officer Joseph Iannetta, a patrolman employed by the Allentown Police Department, executed an arrest warrant for Appellant at Ms. Perez's residence and Appellant was taken into custody. After being taken into custody, Appellant was interviewed at police headquarters by Detectives Joseph Vazquez and Stephen Milkovits of

4

the Allentown Police Department. Appellant admitted being at the scene of the altercation and being punched by Devon Robinson. However, Appellant denied shooting Robinson.

The criminal proceedings at hand were commenced on February 14, 2012, with the filing of a criminal complaint against Appellant charging him with the criminal homicide of Devon Robinson.

At his arraignment on April 30, 2012, Appellant entered a plea of "not guilty" to the charge of criminal homicide. That same day, Attorney Dennis G. Charles entered his appearance as counsel for Appellant.

Appellant's jury trial commenced on July 8, 2013. During the trial, Appellant waived his Fifth Amendment rights and testified as the sole defense witness. Through this testimony, Appellant admitted to shooting Devon Robinson. On July 15, 2013, the jury returned a verdict finding Appellant guilty of murder in the third degree.

On October 8, 2013, Judge Lawrence J. Brenner (the undersigned) sentenced Appellant to not less than 20 to not more than 40 years incarceration at a state correctional institution.

Appellant filed the appeal at hand on October 18, 2013. On October 23, 2013, the Court ordered Attorney Michael E. Brunnabend, appellate counsel for Appellant, to file a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b) (Concise Statement).

On November 13, 2013, Appellant filed a Concise Statement raising four appellate issues.

## Discussion and Conclusions of Law

Appellant raises four allegations of error in his Concise Statement:

1. The Court erred in failing to grant the Defendant's objection and/or mistrial request based upon the Prosecuting Attorney's comments during the Commonwealth's case in chief about the Defendant's testimonial silence and invocation of his right to remain silent.

2. The Court erred in failing to act on the Prosecuting Attorney's attempts and comments about the Defense counsel trying to "mislead" or deceive the jury, which comments went far beyond proper advocacy.

3. The Court took a position of advocacy by [its] questioning of the Defendant and/or other defense witnesses while questions were close in form to cross-examination of the witness(s); and,

4. The Court erred by prohibiting the Defense Counsel from examining witnesses about the possible gang membership and involvement of Commonwealth's witnesses or other friends of the victim, which evidence would show the Defendant's reasonable actions to protect himself and the evidence properly corroborated the testimony of the Defendant.

(Concise Statement, at 1-2.)

### *Prosecuting Attorney's Comments*

Appellant's first two issues on appeal address commentary from the Commonwealth during the closing argument and questions posed to Appellant when he testified in his own defense.

With respect to the Commonwealth's cross-examination of Appellant, the defense theory of the case as presented in its opening statement was essentially that Appellant was not the shooter. On the final day of testimony, the last witness called was Appellant. Appellant advised defense counsel during lunch that day that he was in fact the shooter and that he had lied to police when he was interviewed. During Appellant's testimony that afternoon, the following exchange occurred:

6

BY MR. CHARLES:

Q     When the police asked you about whether you performed the shooting, you said you did not; is that right?
A     Yes.
Q     Were you being truthful with them?
A     No.
Q     When is the first time you advised me that you did perform the shooting?
A     Lunch time.
Q     Lunch time. What day?
A     I don't know. I don't know what the date is today.
Q     Today's date?
A     But today is what, I guess, the 12th. A couple minutes ago.
Q     So you told me about a little over an hour and-a-half ago; is that right?
A     Yes.
Q     Why did you persist in denying that you were the shooter?
A     Because I know I'm going to be killed.

(N.T. Jury Trial, at 909-10.)

On cross-examination, the Commonwealth asked the following questions of

Appellant:

BY MR. SCHEETZ:

Q     Mr. Gonzalez, you sat up here for 15, 20 minutes and denied shooting Devon Robinson, correct?
A     I said I did.
Q     When you first sat here you said you did not shoot Devon Robinson, correct?
A     I said I did.
Q     Your first question from Mr. Charles, you said you got scared and you ran, you did not shoot Devon Robinson, correct?
A     He asked me.
      MR. CHARLES:     Excuse me, Your Honor. Objection.
      THE COURT:     The objection's overruled.
A     He never said that.

(N.T. Jury Trial, at 913-14.)

During Attorney Scheetz's closing, he argued:

7

Okay, common sense, what happened here? What happened in this Court? A week of testimony, a week of hearing from witnesses. Mr. Gonzalez, I see sitting over there. Do you remember their opening statements? A little confusing, ah? Think about it. What did they propose to you? It wasn't my guy. But if it was my guy, I have an explanation why it was. What happened here? Mr. Gonzalez sat there listening to every ounce of evidence, listened to his girlfriend come in here, his friends from jail, his friend Sencillo, all the independent eye witnesses pointed him out. So what does he do? He's playing a game with you, ladies and gentlemen. What did he do? They got me. I'm cornered. I have no other option. What did he do at that point? What did Mr. Charles ask you? Oh, at the lunch time was the first time he told me this. He sat there and realized that we had them, that you had them. You knew he was the shooter. He had no way out. And then he decides -- it's a game to him -- he's calculating. He's manipulative. That's what kind of person he is. He waited until all these witnesses. You saw Ambar Perez. How was she testifying up here? It was physically difficult for her to testify. He waits for the ballistics people to get up there. There is one weapon that was fired, one. The eye witnesses, the DNA, he waited for all that. What does your common sense say? They got me. Plan B. That's what happened here, ladies and gentlemen.

(N.T. Jury Trial, at 1026-27.)

Following Attorney Scheetz's closing argument, defense counsel objected to this reference and properly preserved his argument for appellate review. *See* Pa.R.A.P. 302(a). Defense counsel moved for an immediate mistrial.

A trial court may only grant a mistrial when "the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." *Commonwealth v. Wright*, 961 A.2d 119, 142 (Pa. 2008). Review of a trial court's denial of a motion for a mistrial is limited to determining whether the trial court abused its discretion. *Id.* at 142. An abuse of discretion requires more than a mere error of judgment. *Id.* Thus, discretion is abused only when "in reaching a conclusion the law is overridden or misapplied, or the

judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." *Id.* (quoting *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003)).

It is well-established that attorneys' arguments are not evidence, and may only be considered to the extent they are supported by the evidence. *See Commonwealth v. Baez*, 720 A.2d 711, 729 (Pa. 1998) (noting that a prosecutor's comments do not constitute evidence). Furthermore, a prosecutor's comments will not constitute reversible error "unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a true verdict." *Id.* (citing *Commonwealth v. Sam*, 535 Pa. 350, 362, 635 A.2d 603, 608 (1993), *cert. denied*, 511 U.S. 1115, 114 S.Ct. 2123, 128 L.Ed.2d 678 (1994); *Commonwealth v. Jones*, 530 Pa. 591, 607, 610 A.2d 931, 938–39 (1992)).

Pennsylvania case law recognizes that the Commonwealth is not permitted to impeach a testifying defendant regarding the inconsistency between silence at the time of arrest, but before *Miranda* warnings are administered, and his trial testimony. *See Commonwealth v. Turner*, 454 A.2d 537, 539-40 (Pa. 1982). However, where a defendant gives a statement to the police and later acknowledges that his statement was a falsehood, a prosecutor may properly ask questions tending to highlight that inconsistency to the jury. *See Commonwealth v. McNeal*, 319 A.2d 669, 673 (Pa. 1974) (cross-examination question posed to defendant whose in-court testimony contradicted what he told police officers regarding whether he was "lying" to them does not create prejudice, bias, or hostility in the jury).

9

This case presents a factual scenario where Appellant, through his direct examination, opened the door to questions about his credibility on cross-examination and comments on his credibility during the Commonwealth's closing argument. Appellant testified unequivocally on direct examination that he was not truthful with the police. He acknowledged for the first time while he testified that he was indeed the shooter who killed Devon Robinson. The Commonwealth was then at liberty to ask appropriate questions to call attention to Appellant's in-court admission and the contradictory statements he made and position he took prior to that day because it reflected on his credibility.

Appellant asserts, as defense counsel did following the Commonwealth's closing statement, that the Commonwealth made reference to Appellant's testimonial silence and his invocation of his right to remain silent. This is not the case. The Commonwealth properly emphasized through its questioning of Appellant that he had lied to the police and was now acknowledging that fact.

The Court must acknowledge that the Commonwealth's initial questions to Appellant on cross-examination mischaracterized Appellant's direct examination testimony. During his direct examination, Appellant testified that he shot Devon Robinson and never denied the shooting. The Commonwealth's questions indicating that Appellant denied the shooting on direct examination were incorrect. However, Appellant properly responded by indicating that his testimony was that he did shoot Devon Robinson. Additionally, while the Commonwealth's questions on cross-examination mischaracterized Appellant's testimony on direct examination, the Court issued an instruction during its

10

final charge that the jurors were to rely solely on their own recollection of the testimony, not counsels' recollections.

Furthermore, the Commonwealth's comments during its closing argument attempted to offer some explanation as to why Appellant changed his mind. During a closing argument, it is entirely proper for a prosecutor to summarize the evidence, offer reasonable deductions and inferences for the jury to draw therefrom, and argue the evidence establishes the defendant's guilty beyond a reasonable doubt. *Commonwealth v. Thomas*, 54 A.3d 332, 338 (Pa. 2012) (citation omitted). Comments constituting mere oratorical flair are not objectionable because a prosecutor is free to present his argument with a logical amount of force and vigor. *Id.*; *Commonwealth v. Hutchinson*, 25 A.3d 277, 306-07 (Pa. 2011). Here, the Commonwealth endeavored to offer the jury an explanation for why Appellant decided to admit his guilt for the first time on the final day of testimony. The evidence, both circumstantial and direct, showed that Appellant was guilty, and Appellant opened the door to commentary on his prior lies to police when he outwardly acknowledged that he had lied to them during their investigation.

Accordingly, Attorney Scheetz's comments regarding Appellant's admission that he lied to police were proper and do not constitute reversible error.

The next issue also concerns Attorney Scheetz's comments during his closing argument. At the outset of the Commonwealth's closing argument, Attorney Scheetz remarked:

> I'm not going to talk to you like I'm a doctor of the law. I like that, but I'm
> not going to talk down to you. I'm not going to lecture you. I'm not going
> to make you sit through class. What I want to do is talk to you about
> common sense, okay. Common sense each of you has in your everyday

11

experience. That's what I'm going focus on. **The defendant's job, Mr. Charles' job, is to argue. It's also to confuse you, to muddy the water.**

(N.T. Jury Trial, at 1025 (emphasis added).)

Defense counsel objected and his objection was overruled. Following the closing argument and after the jury was excused, Attorney Charles moved for a mistrial, which was denied.

In similar case, *Commonwealth v. Carter*, 855 A.2d 885 (Pa. Super. 2004) (rev'd on other grounds, *Commonwealth v. Knox*, 50 A.3d 749 (Pa. Super. 2012)), the Commonwealth argued to the jury that the defense was attempting to muddy the water by using an allusion to compare the defendant's trial strategy to an octopus clouding the water and escaping by releasing its pouch of ink. *Carter*, 855 A.2d at 889. The Superior Court reviewed these comments and found no reversible error. *Id.* at 890. It reasoned that counsel is permitted to use a certain amount of oratorical flair in presenting its case to the jury, and the Court gave the jury a cautionary instruction reminding it that comments by the attorneys do not constitute evidence in the case. *Id.* at 889-90.

Applying the standards set forth above, Attorney Scheetz's comments were not grounds for a mistrial. Attorney Scheetz appealed to the jurors' common sense to render their verdict without being overly confused by defense counsel's argument. Defense counsel's closing summarized the testimony and evidence and previewed various legal topics that were later explained in full in the closing instructions by the Court. Defense counsel's closing was legalistically-styled and the Commonwealth's closing took a common sense approach which responded to defense counsel's closing. *See Commonwealth v. Judy*, 978 A.2d 1015, 1019 (Pa. Super. 2009) (citation omitted) (noting

12

prosecutor may fairly respond to defense counsel's closing). Finally, during the closing instructions, the Court instructed the jury:

> Now, the attorneys have made reference to some testimony in the case during their closing arguments. I may make some reference to some portions of the testimony in order to point out the issues which you must resolve. **Neither the lawyers, who are respected members of the bar, nor would I intentionally mislead you with respect to any of the testimony that has been produced.** Nevertheless, if through some inadvertence, the recollection of the attorneys or the recollection of myself should be at variance with your recollection, then disregard what we say the evidence or statement was and rely upon your own recollection of what that testimony has been.

(N.T. Jury Trial, at 1046-47 (emphasis added).)

Accordingly, a proper cautionary instruction was issued advising the jury that counsel did not attempt to mislead them with respect to testimony. Jurors are presumed to follow the court's instructions. *Commonwealth v. Passarelli*, 789 A.2d 708, 713 (Pa. Super. 2001) (citation omitted). Therefore, Attorney Scheetz's comments regarding the defense attempting to muddy the water and confuse the jury were not improperly prejudicial to Appellant and an appropriate cautionary instruction was issued during the closing instructions.

In sum, none of Attorney Scheetz's comments or questions posed to Appellant were improperly prejudicial such that they warranted a mistrial. Appellant's change of position and admission on direct examination that he lied to the police opened the door to examination of that area on cross-examination and commentary during the closing. Further, Attorney Scheetz's comments during the closing about defense counsel attempting to muddy the water were proper and within the scope of oratorical flair

13

afforded to counsel during their closings, and a proper cautionary instruction was issued during the closing instructions. No relief is due.

### Questioning by the Court

In his third issue, Appellant asserts that the Court assumed a position of advocacy by questioning Appellant using questions which were close in form to cross-examination.

Admissibility of evidence is a matter of discretion for the trial court and only amounts to reversible error when there is a showing of both abuse of that discretion and resulting prejudice. *Commonwealth v. Glass*, 50 A.3d 720, 724-25 (Pa. Super. 2012) (citation omitted).

With respect to trial court questioning of witnesses or the defendant, Pennsylvania appellate courts have noted that trial judges must be ever cautious that their questioning of any witnesses "not show bias or a belief in the credibility of particular witnesses." *Commonwealth v. Hogentogler*, 53 A.3d 866, 880 (Pa. Super. 2012) (quoting *Commonwealth v. Folino*, 439 A.2d 145, 148 (Pa. Super. 1981)). Nonetheless, trial judges have the "inherent right, and, at times, the duty to question witnesses to clarify existing facts and to elicit new information." *Id.* Thus, where clarification or eliciting new information are the objectives of the questioning and it is neither unduly protracted or conducted in a manner demonstrating bias, the trial judge's discretion in questioning witnesses will not be found erroneous. *Id.*

In this case, the sole defense witness was Appellant. At two points during Appellant's testimony, the Court asked questions of Appellant. First, during cross-examination, the following exchange occurred:

14

BY MR. SCHEETZ:

Q    Okay. Your testimony was that, basically, you got to the gas station. There was a fight. Someone pulled a gun, you ran?

A    No, no, that's not what happened. I got punched. You're not being specific.

Q    All right.

A    Can you be specific, please?

Q    You got up here on the witness stand.

A    Yes.

Q    And you said that someone pulled a gun out and you were afraid for your life and you ran, correct?

A    No.

THE COURT: Let me just ask one question. Back at Sixth and Gordon, at that time when you were down there.

THE WITNESS: Yes.

THE COURT: Why did you put that gun in your waist at that point and take it with you?

THE WITNESS: I took it from Choko since he was a minor.

THE COURT: Why didn't you just leave it there? Why did you take it and put it in your possession?

THE WITNESS: You're right, but he was acting out of control, and then a minor had it.

THE COURT: Why did you do that?

THE WITNESS: Because I seen that --

THE COURT: You had no permit to carry a gun; did you? No lawful right to carry that gun; did you?

THE WITNESS: No.

THE COURT: You put it in your waistband and took it up to the 10th and --

THE WITNESS: I was going to walk home, and when I seen Kareem Lomax, and I know he's a Blood member --

THE COURT: Why didn't you --

THE WITNESS: -- I was scared.

THE COURT: Why didn't you get rid of the gun right away?

THE WITNESS: Because I was going to walk home. I was scared because I know Mario shot at Kareem Lomax at Sixth and Gordon.

THE COURT: All right. Go on.

(N.T. Jury Trial, at 914-15.)

The Court first notes that defense counsel did not object to this line of questioning,

which constitutes waiver of the issue for appellate purposes. Pa.R.A.P. 302(a) ("Issues

15

not raised in the lower court are waived and cannot be raised for the first time on appeal."). Even if defense counsel had objected, the questioning was proper to clarify Appellant's responses to Attorney Scheetz's questions because Appellant was nonresponsive to Attorney Scheetz in his requests for additional specificity. Furthermore, this line of questioning could theoretically have been helpful to Appellant if he had a permit to carry a firearm. Nonetheless, these questions drew no objection from defense counsel, and as a result, they cannot serve as the basis for an appellate issue.

The second interaction between the Court and Appellant came at the close of defense counsel's redirect examination:

> THE COURT: Before -- let me ask you a question. You were here. You heard the testimony of the parties. You saw the video. You saw the time when Devon got shot. You recall the figure on that video pointing that -- the weapon, and the testimony that Devon got shot in the chest and then shot in the head. Do you recall that?
> THE WITNESS: I don't remember.
> THE COURT: You don't -- you remember it as far as seeing it in the courtroom?
> THE WITNESS: Well, we seen it.
> THE COURT: And you saw it?
> THE WITNESS: Pardon me?
> THE COURT: And the party who evidently did it, the aim was pretty good; wasn't it? Right in the chest, right in the head?

(N.T. Jury Trial, at 937.)

At this time, defense counsel objected and moved for a mistrial. A discussion was held at sidebar as follows:

> MR. CHARLES: I object to this. I'm going to move for a mistrial. You're -- you're -- you're almost taking on the cross-examination for the Commonwealth.
> THE COURT: No, I'm not.
> MR. CHARLES: I mean, what does aim have to do with anything?
> THE COURT: Except he just indicated that --

16

MR. CHARLES: Are you trying to make out the case for the prosecution?

THE COURT: No, I'm not trying to, but I asked the question, and the Court --

MR. CHARLES: I thought the Court's position was they weren't going to do this.

THE COURT: The Court has a right to ask these questions. If you wish, I will limit it at this point.

MR. CHARLES: Let me just express my concern, Your Honor. Your Honor has been very gracious to this jury from the time we picked it. The jury respects Your Honor, as they should. I don't know if you realize this, but you appear to be taking almost, like, an angry cross-examination approach towards my client. The jury can see this. I think it's unfairly prejudicial to my client, and I think it is going to tip the balance of how this verdict is going to come out if you persist in doing this. I would respectfully request Your Honor to leave the questions to the District Attorney's Office.

THE COURT: Mr. Charles, let me indicate, the Court does have a right to --

MR. CHARLES: I understand. It almost looks as though you're trying impeach my client. That's what it looks like.

THE COURT: Mr. Charles, that would not be the case. Clearly, my questions were basically – I will agree, certainly, at this point, I will not ask any further questions unless I feel it's in the interest of justice.

MR. CHARLES: And I respectfully say this: I'm saying this out of due respect to the Court. Please don't take offense; are you trying to impeach my client? That's what it looks like with the questions.

THE COURT: That would not be the case, believe me. You've known me for many, many years.

MR. CHARLES: I know that. I know that. Sometimes we can't see what we appear like in --

THE COURT: Mr. Charles. You may take over. (Speaking to Mr. Scheetz)

(N.T. Jury Trial, at 937-39.)

The Court asked no further questions of Appellant following the sidebar discussion. The questions asked of Appellant showed no bias on the Court's part. It was also not designed to influence the jury with respect to Appellant's credibility. Nevertheless, as a precautionary measure during the closing instructions, the jury was instructed as follows:

17

Now, the questions that a counsel may put to the witnesses are not evidence. I also indicate to you that the questions I may have posed to a witness are not evidence.

You should not guess that a fact is true just because one of the attorneys or I asked a question about it. It is the witness's answers that provide the evidence.

Of course you may have to consider the question to know what a witness means by his or her answer. For instance, if a witness responds yes to a question, you have to know the question to understand what the witness is really saying, in other words, their response to a question.

**But, again, I reinforce with you, any question that I may have asked is not evidence in the case. It's not to be taken that I in any way was showing favor. I don't take sides. And that's my oath, that's my responsibility, to keep a level playing field.** You and you alone are the sole judges of the facts. Now, I indicate to you that you are the finders of fact.

(N.T. Jury Trial, at 1048-49 (emphasis added).)

As the Superior Court has observed,

A factor to be considered in assessing the impact of error, if indeed there was one here, is whether the trial court instructed the jury to disregard information improperly before it. Prejudice can be rectified and rendered harmless by such instructions. The instructions need not be given immediately following the erroneous admission, but may occur later in the charge. It must be assumed that the jury obeys the instruction and that the error is thereby rendered harmless.

*Commonwealth v. Rough*, 418 A.2d 605, 611 (Pa. Super. 1980) (citations omitted).

To demonstrate that the questions posed to Appellant constituted reversible error, Appellant must demonstrate abuse of discretion *and* resultant prejudice. *Glass*, 50 A.3d at 724-25 (citations omitted). In this case, Appellant cannot do so. The Court, out of an abundance of caution, issued a cautionary instruction reminding the jury that it should not interpret any questions posed by the Court as being indicative of favoritism toward one

18

side or the other. This counterbalanced any appearance of bias and redirected the jurors' focus to the testimony of the witnesses alone. Additionally, questions posed to Appellant regarding his aim in using the firearm, at their worst, addressed the element of intent to kill for murder in the first degree. *See Commonwealth v. Bedford*, 50 A.3d 707 (Pa. Super. 2012) (specific intent to kill can be inferred from use of a deadly weapon on a vital part of victim's body). The jury returned a verdict of murder in the third degree, which has no requirement of intent to kill. Third-degree is a killing with malice which is neither intentional nor committed during the perpetration of a felony, but contains the requisite malice. *Commonwealth v. Morris*, 958 A.2d 569 (Pa. Super. 2008). Appellant's conviction of murder in the third degree and the cautionary instruction issued to the jury belies Appellant's claim in this case because Appellant cannot demonstrate prejudice.

As a result, the Court's questions posed to Appellant were proper and any perceived impropriety was corrected by an appropriate cautionary instruction.

### Gang Membership of Commonwealth Witnesses

In his fourth appellate issue, Appellant contends that the Court erred in precluding defense counsel from examining Commonwealth witnesses about their possible membership in gangs. Appellant argues that this prevented him from demonstrating that he acted in self-defense when he shot and killed the victim. This contention lacks merit.

A review of the trial transcript reveals that defense counsel, through cross-examination, attempted to demonstrate that Kareem Lomax was a known member of the Bloods street gang. (N.T. Jury Trial, at 137, 604, 845, 864, 889, 956.) Defense counsel also attempted to show that Nelson Soler was affiliated with the Bloods. (N.T. Jury Trial,

19

at 442). Both Lomax and Soler testified as witnesses for the Commonwealth at Appellant's trial. The Commonwealth objected to defense counsel's attempts to show the gang affiliation of these two witnesses and the Court sustained the objections based on irrelevancy.

"All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. "Evidence is considered relevant if it logically tends to establish a material fact in the case, tends to make the fact at issue more or less probable, or supports a reasonable inference or presumption regarding the existence of a material fact." *Commonwealth v. LaCava*, 666 A.2d 221, 227-28 (Pa. 1995). Nonetheless, admissibility of evidence is left to the sound discretion of the trial court and evidentiary rulings will be reversed only where there is a showing of both abuse of that discretion and resulting prejudice. *Commonwealth v. Glass*, 50 A.3d at 724-25 (citation omitted).

As stated in the "Factual and Procedural History" section above, Manuel DeLaRosa and Mario Nunez chased and shot at Kareem Lomax after an altercation in front of Darlene DeLeon's residence on the night of October 21, 2011. Later, in the early hours of October 22, 2011, Lomax confronted DeLaRosa about the earlier incident when the two inadvertently met at the Sunoco gas station. Appellant was present at the Sunoco with DeLaRosa. Soler was also present at the Sunoco as a member of Lomax's group. The confrontation between Lomax and Manuel DeLaRosa instigated the brawl that ultimately resulted in Devon Robinson punching Appellant and Appellant retaliating by shooting and

20

killing Robinson. At some point during this brawl, Soler pointed a gun in the direction of Appellant's group.

On the night of the shooting, Lomax in no way threatened Appellant or put him in fear for his life. In fact, Appellant testified that he knew Lomax and that no animosity existed between the two men. Whether Lomax was a member of the Bloods gang had no bearing on Appellant's decision to chase, shot and kill Devon Robinson. Therefore, the admission of such evidence could not possibly be relevant to any potential justification or self-defense claim of Appellant.

Additionally, Appellant, through his own testimony, admitted to being an acquaintance of Lomax. The two men resided in the same neighborhood and saw each other on a regular basis. In fact, Appellant explained that he would greet Lomax with a handshake whenever the two would meet. Allowing evidence of Lomax's gang affiliation could have prejudiced Appellant in the eyes of the jury in that it would have shown him to be associated with a member of a violent street gang.

As to Soler, the jury heard testimony that Soler pointed a gun in the direction of Appellant's group at the Sunoco Station. While this evidence could potentially be relevant to a self-defense claim against Soler, Appellant shot and killed Devon Robinson, not Soler. Evidence of Soler's purported gang membership is even more attenuated. In light of the fact that Appellant admitted that he interacted socially with Bloods like Lomax, the question of whether Soler belonged to the Bloods gang had no bearing on Appellant's claim that he was in fear for his life on the night of the shooting.

21

Finally, Appellant took the stand and testified as to his belief that Lomax and many others in the large group he was with at the Sunoco were affiliated with the Bloods street gang and that the Bloods had a reputation for violence. (N.T. Jury Trial, at 896). The Commonwealth did not object to this testimony. Appellant's trial testimony in this regard was corroborated by the trial testimony of Marco Bowen. Bowen took the stand as a Commonwealth witness and testified that, while both he and Appellant were inmates at Lehigh County Prison, Appellant had admitted to him that he killed Devon Robinson. Bowen also testified that Appellant told him that the shooting related to his problems with the Bloods and that he feared the Bloods. (N.T. Jury Trial, at 594, 604-05). Thus, the jury was aware of Appellant's contention that he was in fear for his safety when he encountered the large group of purported Bloods on the night of October 22, 2011.

For all of these reasons, evidence of the alleged gang membership of Lomax and Soler was properly excluded at trial as irrelevant without compromising Appellant's ability to make his argument to the jury regarding his fear for his safety.

\* \* \* \* \* \* \* \* \*

In sum, all of Appellant's allegations of error lack merit. Therefore, it is respectfully submitted that this appeal be denied.

December _11_, 2013       _____
                               LAWRENCE J. BRENNER, SENIOR JUDGE

22