J-A28045-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
IRVING RICHARDSON :
:
Appellant : No. 3080 EDA 2018

Appeal from the Judgment of Sentence Entered September 25, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0008028-2016

BEFORE: PANELLA, P.J., STABILE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED DECEMBER 24, 2019**

Appellant Irving Richardson appeals from the judgment of sentence

entered in the Court of Common Pleas of Philadelphia County following his

conviction at a bench trial on the charges of third-degree murder and

possession of an instrument of crime.[1]  After a careful review, we affirm.

The relevant facts and procedural history are as follows: Appellant was

arrested in connection with the stabbing death of McKinley Smith ("Mr.

Smith"), and represented by counsel, he proceeded to a bench trial.  At trial,

Philadelphia Police Officer Gregory Dixon testified that, on June 26, 2016, at

approximately 6:15 p.m., he was on routine patrol with his partner in a

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2502(c) and 907(a), respectively.

marked patrol vehicle when he observed a male, who was later identified as Mr. Smith, standing in the middle of the intersection at 52nd Street and Kingsessing Avenue. N.T., 5/16/18, at 26-27. Mr. Smith flagged down the police vehicle, and Officer Dixon noticed "a bunch of blood shooting from [his] stomach area." *Id.* at 27. Mr. Smith walked towards the sidewalk, and Officer Dixon stopped the police vehicle. *Id.*

Officer Dixon noticed a large hole in Mr. Smith's lower left abdomen. *Id.* Officer Dixon asked Mr. Smith what had happened, and he "pointed across the street and said, Mother-f\*\*\*er stabbed me." *Id.* Officer Dixon testified that Mr. Smith pointed to a knife-wielding man, who then began running with the knife in his hand towards Paxon Street. *Id.* at 28, 30. Officer Dixon and his partner drove off after the man, who was later identified as Appellant. *Id.*

Upon entering Paxon Street, the officers exited their vehicle and surveyed the area, at which point people began pointing towards a vehicle parked alongside the street. *Id.* at 29. Officer Dixon approached the area of the vehicle and observed Appellant lying in a fetal position on the ground with the knife still in his hand. *Id.* Appellant was partially under the vehicle. *Id.* at 45.

Office Dixon drew his firearm and ordered Appellant to drop the knife. *Id.* at 30. Meanwhile, Officer Dixon's partner approached, handcuffed Appellant, and retrieved the knife without touching it with his hands. *Id.* Officer Dixon then called for medical assistance for Mr. Smith; Officer Dixon

testified that he observed no injuries to Appellant. *Id.* at 30-31. By the time Officer Dixon returned to the area where he had left Mr. Smith, he discovered Mr. Smith was unconscious. *Id.* at 33. Fellow police officers began to transport Mr. Smith to the hospital, and during the transport, they met an ambulance, which took Mr. Smith to the hospital. *Id.* Mr. Smith later died from his wound.

Meanwhile, Officer Dixon spoke to Mr. Smith's paramour, who was at the scene, and transported her to the police station so that she could give an interview. *Id.* Officer Dixon testified he submitted the knife for fingerprint analysis. *Id.* at 37. He noted the knife was a utility-type knife, and when the police seized it from Appellant, the blade was extended out and there was blood on the knife. *Id.* at 37-38.

Hueland Walden testified he lives on the 1300 block of Paxon Street, and on June 26, 2016, at around 6:15 p.m., he was outside washing cars when he observed a man running down Paxon Street from the direction of Kingsessing Avenue. N.T., 5/22/18, at 5-6. The man threw something at a house's window, but the item "bounced back," so the man picked it up. *Id.* at 6. The man then attempted to slide under a vehicle parked alongside the street. *Id.* Two or three seconds later, the police appeared and arrested the man. *Id.* at 7.

Diane Whitman testified Mr. Smith was her paramour. *Id.* at 16. On June 26, 2016, she and Mr. Smith were at her home and decided to walk to a

store on Kingsessing Avenue. *Id.* at 19. Upon direct-examination, Ms. Whitman testified the following occurred as the couple walked to the store (verbatim):

**Q.** Tell us what happened as you were walking to the store to get beer.

**A.** I was walking. I was in front of him. I walked fast. So [Mr. Smith] said, Why you got to be walking so fast? So I turned around and told him, You know I walk—then I ain't even get it out. When I turned around, he was in front of his door on the ground. A guy was on top of him. They was fighting and I was looking. And I thought it was some of his nephews playing or something. So I stood there and I said, Come on now. Here they go. And then when I noticed that they were serious, I said, Oh, you really fighting somebody. So I'm trying to look and see who was the person and stuff.

And when [Mr. Smith] got up, it looked like he was like in the street trying to fight the guy. Like telling the guy, Come on. I noticed he was bleeding. So I ran into his grandmom's house because everybody usually be in there. But it wasn't nobody at the time but his grandmom. I said. There's nobody here? She said, No. I hollered up the steps. I said, Who is here? Nobody said nothing. I didn't want to tell his grandmom like he was stabbed. So I like said it a little bit towards—she's an older lady. I said, [Mr. Smith] was stabbed. When I came outside, the cops was there. And they—another cop was coming around the corner with the guy and the knife in his hand.

**Q.** Ma'am, when you were walking with [Mr. Smith] along 52nd Street headings towards the beer store, was it just you two?

**A.** Yes.

**Q.** Did you notice anyone in your vicinity or in your area where you were walking?

**A.** Just neighbors.

**Q.** Were there any words exchanged with anybody as you and [Mr. Smith] were walking?

**A.** No.

**Q.** So [Mr. Smith] said to you—the last words you remember [Mr. Smith] saying to you were, Why are you walking so fast?

**A.** Yes.

**Q.** And when you turned around, what did you see?

**A.** A guy on top of him.

**Q.** Do you know where this guy came from?

**A.** No.

**Q.** Do you recognize this individual?

**A.** No.

**Q.** Were you aware of any problems [Mr. Smith] was having with this person?

**A.** No.

*** 

**Q.** Did he say anything before he was on top of [Mr. Smith]?

**A.** No, not that I know.

**Q.** What did you see the person that was on top of [Mr. Smith], what did you see this person doing?

**A.** Like punching him.

*** 

**Q.** Were you able to see anything in his hands from your vantage point?

**A.** No.

**Q.** Why not?

**A.** I couldn't see it.

**Q.** How long was the person on top of [Mr. Smith]?

**A.** I don't think it was a minute.  Like seconds.

**Q.** It was quick?

**A.** Yes.

**Q.** How did it end?  Did [Mr. Smith] remain on the ground the whole time?

**A.** Yes.

**Q.** At some point in time did [Mr. Smith] get up?

**A.** Yes.

**Q.** How did that happen?

**A.** [Mr. Smith] got up and was in the street.

**Q.** Did the person that was on top of [Mr. Smith] get off of him? Do you know how [Mr. Smith] was able to get up?

**A.** No.

**Q.** So when [Mr. Smith] got up, did you notice any injuries to his body at that time?

**A.** Yeah. He was bleeding.

**Q.** Where could you see he was bleeding from?

**A.** Coming from the side.

**Q.** Could you tell how he had sustained that injury?

**A.** Stabbed.

*** 

**Q.** What did [Mr. Smith] do at that time?

**A.** He looked like he was trying to defend himself.  Like to call the guy out or something.

- 6 -

**Q.** I missed that last part.

**A.** Like he was calling the guy out.  Like come on or something, but he started bleeding.  That's when I ran into the house.

*Id.* at 20-25.

Ms. Whitman indicated that, immediately after the attack, she gave a statement to the police.  Therein, she confirmed that the man apprehended by Officer Dixon and his partner was the same man who had attacked Mr. Smith.  *Id.* at 35.  This man was later identified as Appellant.  *Id.*  She testified that, prior to the attack, she did not know Appellant.  *Id.* at 62.  She noted that, when she first noticed the attack, Appellant was on top of Mr. Smith, and Mr. Smith was on the ground on his stomach, unable to defend himself in any manner as Appellant stabbed him.  *Id.* at 63-64.

Dr. Khalil Wardak, a medical examiner, testified that he performed Mr. Smith's autopsy.  *Id.* at 98.  He indicated Mr. Smith died from a six inch deep stab wound to his left groin area that went deep into the pelvic area where the intestines and major arteries are located.  *Id.* at 101.  Dr. Wardak explained that Mr. Smith's external iliac artery was cut during the stabbing, and as a result, Mr. Smith succumbed to major blood loss.  *Id.* at 102.  He indicated the wound path was left to right, front to back and downwards.  *Id.* at 103.  He testified Mr. Smith had no defensive wounds, which suggested he was surprised by the attack.  *Id.* at 105-07.

At this point, the parties entered into several stipulations, including that swabs of the stain on the blade of the knife, as well as Kingsessing Avenue,

matched DNA taken from Mr. Smith. *Id.* at 133-34. Further, a swab from the handle of the knife "is consistent with a mixture originating from at least two individuals," with a "major component" of the DNA matching the DNA of Mr. Smith with Appellant as a "contributor."[2] *Id.* at 134.

At the conclusion of all evidence, the trial court convicted Appellant of the offenses indicated *supra*, and on September 25, 2018, the trial court sentenced Appellant to 17½ years to 35 years in prison for third-degree murder, and one year to two years in prison for possession of an instrument of crime, the sentences to run consecutively. Appellant filed a timely post-sentence motion, which the trial court denied, and this timely appeal followed. All Pa.R.A.P. 1925 requirements have been met.

On appeal, Appellant presents the following issues in his "Statement of the Questions Involved" (verbatim):

1. Was not the evidence insufficient to support appellant's convictions for the offenses of murder of the third degree and possession of an instrument of crime as the Commonwealth failed to disprove that appellant acted in self-defense?

2. Was not the evidence insufficient to prove beyond a reasonable doubt that appellant was guilty of murder in the third degree in that the evidence was insufficient to prove beyond a reasonable doubt that appellant was not acting under a sudden

---

[2] The parties stipulated that the DNA evidence on the knife's handle revealed the following as to Appellant: It was 225,000 times more likely that the DNA originated from Appellant than a random Caucasian, 9,488 times more likely that it originated from Appellant than a random African-American, and 145,000 more times likely that it originated from Appellant than a random Hispanic. N.T., 5/22/18, at 135.

and intense passion resulting from serious provocation by the decedent?

3. Must guilty verdicts that were based on speculation and conjecture be reversed where the Commonwealth's evidence of appellant allegedly straddling and stabbing the decedent when he was on the ground was based on inconsistent, unreliable and contradictory testimony that was not supported by the incontrovertible physical facts?

4. Should not a new trial be awarded where the verdict was so contrary to the weight of the evidence as to shock one's sense of justice?

5. Did not the lower court err and abuse its discretion by sentencing [Appellant] to a sentence based on the nature of the offense without giving proper consideration to [Appellant's] personal needs and mitigating factors, and as a result was not the sentence contrary to the fundamental norms underlying the sentencing process making it manifestly unreasonable and excessive?

Appellant's Brief at 6.

In his first issue, Appellant contends the evidence was insufficient to support his convictions for third-degree murder and possession of an instrument of crime because the Commonwealth failed to disprove his claim of self-defense beyond a reasonable doubt.

Initially, we note:

A determination of evidentiary sufficiency presents a question of law. As such, the appellate court's standard of review is *de novo* and its scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part,

or none of the evidence.  The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

*Commonwealth v. Russell*, 209 A.3d 419, 426 (Pa.Super. 2019) (citations omitted).

Third-degree murder is defined as "'all other kinds of murder,' *i.e.*, those committed with malice that are not intentional (first-degree) or committed during the perpetration of a felony (second-degree)." *Commonwealth v. Packer*, 641 Pa. 391, 168 A.3d 161, 168 (2017).  To sustain a conviction of third-degree murder, the Commonwealth must prove that the defendant killed another person with malice. *Commonwealth v. Hardy*, 918 A.2d 766, 774 (Pa.Super. 2007).  Malice is defined as "exhibiting an 'extreme indifference to human life.'"  *Commonwealth v. Ludwig*, 583 Pa. 6, 874 A.2d 623, 632 (2005) (quotation omitted) (emphasis removed).

A fact-finder may find malice not only in an intentional killing, "but also in an unintentional homicide where the perpetrator 'consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily injury.'" *Id.* (quotation omitted) (emphasis removed).  A fact-finder may also infer malice "from the use of a deadly weapon upon a vital part of the victim's body." *Commonwealth v. Thomas*, 618 Pa. 70, 54 A.3d 332, 335-36 (2012).

Here, the Commonwealth presented sufficient evidence to prove, beyond a reasonable doubt, that Appellant acted with malice when he fatally stabbed Mr. Smith in a vital part of his body, *i.e.*, his groin into his pelvic area. As he lay bleeding on the ground, Mr. Smith identified Appellant as the person who stabbed him, and the police apprehended Appellant nearby in possession of the knife. Further, Ms. Whitman, who was walking with Mr. Smith during the attack, positively identified Appellant as the person who stabbed Mr. Smith.

Moreover, the medical examiner, Dr. Wardak, testified Mr. Smith died from the six inch deep stab wound to his left groin area that went deep into the pelvic area where the intestines and major arteries are located. Dr. Wardak explained that Mr. Smith's external iliac artery was severed, and Mr. Smith succumbed to major blood loss. Clearly, Appellant's stabbing of Mr. Smith in the groin was sufficient evidence of Appellant's extreme indifference to Mr. Smith's life. **See Thomas**, **supra**.

Regarding Appellant's claim the Commonwealth failed to disprove self-defense as to third-degree murder, we disagree. "If a defendant introduces evidence of self-defense, the Commonwealth bears the burden of disproving the self-defense claim beyond a reasonable doubt." **Commonwealth v. Houser**, 610 Pa. 264, 18 A.3d 1128, 1135 (2011). The use of force against a person is justified "when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful

force" by the other person. 18 Pa.C.S.A. § 505(a). A self-defense claim thus entails three elements:

> (1) [Defendant] reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm;
>
> (2) [Defendant] was free from fault in provoking the difficulty which culminated in the slaying; and
>
> (3) [Defendant] did not violate any duty to retreat.

*Commonwealth v. Mouzon*, 617 Pa. 527, 53 A.3d 738, 740 (2012) (quotation omitted).

Here, with regard to his self-defense claim, Appellant contends the "absence of any evidence on how [A]ppellant's fight with the decedent started" supports Appellant's claim that Mr. Smith was initially armed with the knife, brandished it, and caused Appellant to disarm him. Appellant's Brief at 24. To the extent Appellant's claim triggered the Commonwealth's burden to disprove self-defense, we note Ms. Whitman testified she and Mr. Smith were merely walking down the street when Appellant suddenly attacked Mr. Smith.

The trial court, as the finder of fact, specifically found Ms. Whitman's testimony to be credible. Trial Court Opinion, filed 12/6/18, at 6. Thus, the Commonwealth sufficiently disproved Appellant's claim with Ms. Whitman's testimony. *See Commonwealth v. Bullock*, 948 A.2d 818 (Pa.Super. 2008) (holding questions of credibility are for the finder of fact at trial).

Moreover, Appellant claims the DNA evidence, and more specifically, the fact Mr. Smith's DNA was found on the handle of the knife, supports his claim

of self-defense. Appellant's Brief at 24. Appellant reasons that the existence of Mr. Smith's DNA on the handle of the knife proves Mr. Smith was originally carrying the knife and Appellant disarmed him. *Id.* In disproving Appellant's self-defense claim, the Commonwealth noted the parties stipulated the knife had a four inch long blade and a four inch long handle. N.T., 5/22/18, at 132. Dr. Wardak testified the stab wound was six inches deep into Mr. Smith's body. *Id.*

Thus, the Commonwealth argued to the trial court that Mr. Smith's DNA was on the handle because a portion of the knife's handle entered Mr. Smith's body as opposed to Mr. Smith holding the knife in his hands. *Id.* at 164. The trial court was free to accept this fair inference from the evidence. *See Bullock*, *supra*.

Furthermore, Appellant claims that video footage seized by the police from a surveillance camera at a store near the scene refutes Ms. Whitman's testimony that she saw Appellant stab Mr. Smith while Mr. Smith lay on the ground.[3] Appellant's Brief at 25. However, our viewing of the video confirms the trial court's finding that Appellant attacked Mr. Smith from behind and sent him to the ground.[4]

_____

[3] Detective Thorsten Lucke testified he seized the surveillance video from the store and discs therefrom were entered into evidence at trial. N.T., 5/22/18, at 119-25.

[4] The trial court noted in its opinion that the video did not raise any doubt as to Appellant's guilt. Trial Court Opinion, filed 12/6/18, at 6.

Finally, we note the trial court found credible Officer Dixon's testimony that, when Mr. Smith pointed to Appellant as the person who stabbed him, Appellant fled and attempted to conceal himself under a parked vehicle. Trial Court Opinion, filed 12/6/18, at 2. ***Commonwealth v. Bruce***, 717 A.2d 1033 (Pa.Super. 1998) (holding consciousness of guilt may be inferred from flight and concealment).

In light of the aforementioned, viewing the evidence in the light most favorable to the Commonwealth as verdict-winner, we conclude the Commonwealth sufficiently disproved Appellant's self-defense claim as to third-degree murder beyond a reasonable doubt. ***See Bullock***, ***supra*** (holding the Commonwealth must disprove Appellant's self-defense claim beyond a reasonable doubt).

Regarding Appellant's claim the evidence was insufficient to sustain his conviction for possession of an instrument crime, Appellant's claim is premised upon the argument that he possessed the knife in self-defense and did not have the intent to employ it criminally.

To sustain a conviction for possession of an instrument of crime, the Commonwealth must prove that the defendant possessed an "instrument of crime with the intent to employ it criminally." 18 Pa.C.S.A. § 907(a).

As discussed *supra*, the Commonwealth disproved Appellant's self-defense claim as to the murder charge, and accordingly, his claim the evidence was insufficient because he possessed the knife in self-defense also fails. We

conclude the evidence sufficiently established that Appellant used the knife with the intent to employ it criminally, *i.e.*, to stab the victim. Therefore, we find no merit to Appellant's first issue.

In his second issue, Appellant contends the evidence was insufficient to sustain his conviction for third-degree murder as the evidence demonstrated Appellant, at most, was guilty of voluntary manslaughter. Appellant's Brief at 32. In this vein, Appellant contends the evidence reveals he stabbed Mr. Smith while he "was acting under a sudden and intense passion resulting [from] serious provocation, and that [Appellant] therefore lacked malice." ***Id.***

A heat of passion defense is a partial defense, which is focused on the element of intent. ***Commonwealth v. Laich***, 566 Pa. 19, 777 A.2d 1057, 1061 (2001). A defendant accused of murder may establish that he is guilty, not of murder, but rather of voluntary manslaughter, by proving that, at the time of the killing, he was acting under a sudden and intense passion resulting from serious provocation by the victim. ***Commonwealth v. Miller***, 605 Pa. 1, 987 A.2d 638, 649 (2009). Emotions encompassed by the term "passion" include "anger, rage, sudden resentment or terror which renders the mind incapable of reason." ***Miller***, ***supra***, 987 A.2d at 650. Whether the provocation by the victim was sufficient to support a heat of passion defense is determined by an objective test: whether a reasonable man who was confronted with the provoking events would become "impassioned to the

extent that his mind was incapable of cool reflection." *Id.* (quoting

***Commonwealth v. Thornton***, 494 Pa. 260, 431 A.2d 248, 252 (1981)).

> To reduce an intentional blow, stroke, or wounding resulting in death to voluntary manslaughter, there must be sufficient cause of provocation and a state of rage or passion without time to cool, placing the [defendant] beyond the control of his reason, and suddenly impelling him to the deed. If any of these be wanting— if there be provocation without passion, or passion without a sufficient cause of provocation, or there be time to cool, and reason has resumed its sway, the killing will be murder.

***Miller***, ***supra***, 987 A.2d at 651 (quotation omitted).

In the case *sub judice*, Appellant contends "the decedent's conduct on the night of his death initially provoked [Appellant]." Appellant's Brief at 34. However, as indicated *supra*, the trial court found credible Ms. Whitman's testimony that she and Mr. Smith were merely walking down the street when Appellant attacked Mr. Smith. Ms. Whitman testified there was no exchanging of words with Appellant or any indication of a fight prior to Appellant attacking Mr. Smith. The video from a surveillance camera supports Ms. Whitman's testimony in this regard. Accordingly, Appellant has not demonstrated the evidence proved, at most, that he was guilty of voluntary manslaughter, and there is no merit to his second issue.

In his third issue, Appellant contends the evidence was insufficient to support his convictions because the testimony of Ms. Whitman was "so unreliable and contradictory that any verdict of guilt based thereon must have been arrived at through speculation and conjecture." Appellant's Brief at 35. In this vein, he suggests there were "many inconsistencies" in Ms. Whitman's

testimony; she had a motive to "color her testimony" so as to convince the fact-finder that Appellant, as opposed to her paramour, was the aggressor; and her testimony that she saw Appellant "straddling and punching the decedent on the ground" was not consistent with the video evidence. Appellant's Brief at 35-36.

It is well-settled that "[a]n argument regarding the credibility of a witness's testimony goes to the weight of the evidence, not the sufficiency of the evidence." *Commonwealth v. Melvin*, 103 A.3d 1, 43 (Pa.Super. 2014). Nevertheless, in support of his claim that he is challenging the sufficiency of the evidence, Appellant cites to *Commonwealth v. Karkaria*, 533 Pa. 412, 625 A.2d 1167 (1993), and *Commonwealth v. Farquharson*, 467 Pa. 50, 354 A.2d 545 (1976).

In *Farquharson*, our Supreme Court relevantly stated the following:

> Traditionally under our system of jurisprudence, issues of credibility are left to the trier of fact for resolution. While there may be some legitimacy for a trial court, who has also observed the witnesses as they testified, to consider the weight of the evidence and to that extent review the jury's determination of credibility, there is surely no justification for an appellate court, relying solely upon a cold record, to exercise such a function.
>
> On appellate review of a criminal conviction, we will not weigh the evidence and thereby substitute our judgment for that of the finder of fact. To do so would require an assessment of the credibility of the testimony and that is clearly not our function.
>
> This concept, however, must be distinguished from an equally fundamental principle that a verdict of guilt may not be based upon surmise or conjecture. Following this principle, courts of this jurisdiction have recognized that where evidence offered to support a verdict of guilt is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, a jury may

- 17 -

not be permitted to return such a finding. ***Commonwealth v. Bennett***, [ ] 303 A.2d 220 ([Pa.Super.] 1973) [(*en banc*)] (and cases cited therein). [The] [a]ppellant argues that the ***Bennett*** principle is applicable here. We do not agree.

The ***Bennett*** principle is applicable only where the party having the burden of proof presents testimony to support that burden which is either so unreliable or contradictory as to make any verdict based thereon obviously the result of conjecture and not reason. In the facts of the ***Bennett*** case, the Commonwealth had predicated its case upon the evidence of one individual. The record clearly established that the testimony of that witness was so contradictory as to render it incapable of reasonable reconciliation and therefore the court properly refused to allow a verdict of guilt to stand.

***Farquharson***, ***supra***, 354 A.2d at 550 (most internal citations omitted).

Our Supreme Court applied the above holding of ***Farquharson***, ***supra***, in ***Karkaria***, ***supra***, to reverse the appellant's conviction of forcible rape. In ***Karkaria****,* the appellant was charged by private criminal complaint based upon his alleged rape of his younger stepsister. ***Karkaria****,* ***supra***, 625 A.2d at 1167. At trial, the Commonwealth's case rested entirely upon the testimony of the fourteen-year-old alleged victim, who testified that the rapes occurred on weekends when her mother and stepfather were out and the appellant was babysitting her. ***Id.*** at 1168. She denied that her other stepbrother, the appellant's biological brother, was in the house at the time. ***Id.*** It was uncontested, however, that pursuant to the custody arrangement between the appellant's parents, the appellant and his brother were always in the home on the same weekends. ***Id.*** It was likewise uncontested that the alleged victim's mother and stepfather only went out on the weekends. ***Id.*** at 1171.

Moreover, although the alleged victim testified that the rapes occurred when the appellant babysat her, she also acknowledged that during the timeframe of the alleged rapes, she was old enough to watch herself and the appellant no longer acted as her babysitter. *Id.* at 1168. The Commonwealth presented no physical evidence or reports made regarding the alleged rapes. *Id.* at 1169, 1171.

The *Karkaria* Court relevantly concluded:

> The total failure of the Commonwealth to present any evidence that a single act of intercourse occurred during the [timeframe alleged] casts serious doubt upon the [fact-finder's] ability to reasonably conclude that any criminal activity occurred during the time period charged.
>
> ***
>
> [Therefore,] we are compelled to conclude that the evidence presented at trial when carefully reviewed in its entirety, is so unreliable and contradictory that it is incapable of supporting a verdict of guilty, and thus, is insufficient as a matter of law. Having reached this conclusion after careful and meticulous review of the record presented to this Court, we find that the verdict of the [fact-finder] was not based on anything more than speculation and conjecture.

*Id.* at 1171-72 (footnote omitted).

Contrary to Appellant's argument in the case *sub judice*, the holdings of *Farquharson* and *Karkaria* do not require that any case involving allegedly contradictory or inconsistent testimony warrants consideration (let alone reversal) on sufficiency grounds. Rather, as our Supreme Court stated in *Commonwealth v. Brown*, 617 Pa. 107, 52 A.3d 1139 (2012), "the critical inquiry" in resolving a sufficiency claim is as follows:

- 19 -

[W]hether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether **it** believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, **any** rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the fact-finder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review **all of the evidence** is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon "[fact-finder]" discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

[A] reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."

*Id.* at 1163–64 (quotation omitted) (emphasis in original). The **Brown** Court

clarified that despite its holding in **Karkaria**,

the Court considers questions regarding the reliability of the evidence received at trial to be within the province of the finder-of-fact to resolve, and our Court will not, on sufficiency review, disturb the finder-of-fact's resolution except in those exceptional instances, as discussed previously, where the evidence is so patently unreliable that the [fact-finder] was forced to engage in surmise and conjecture in arriving at a verdict based upon that evidence.

*Id.* at 1165.

The case before us is not one that involves evidence that "is so patently

unreliable that the [fact-finder] was forced to engage in surmise and

conjecture in arriving at a verdict based upon that evidence." *Id.* Rather, this case is like the vast majority of criminal cases heard in this Commonwealth in that the evidence presented by the Commonwealth was at odds with the defense's theory of the case.[5] The fact-finder heard testimony from various police officers, the medical examiner, a man who lived near the crime scene, and Ms. Whitman, as well as viewed a video, which the police seized from a nearby business's surveillance camera, and over forty exhibits, including photos from the crime scene.

The question in this case "boiled down" to which witnesses and evidence the fact-finder found credible, and, as stated above, this is a question of the weight to be accorded to the evidence, not its sufficiency. *Melvin*, *supra*. In any event, the testimony presented by Ms. Whitman was largely consistent with the remaining evidence presented by the Commonwealth. As such, no relief is due on Appellant's third sufficiency challenge.[6] *See Commonwealth v. DeJesus*, 580 Pa. 303, 860 A.2d 102 (2004) (finding *Farquharson* inapplicable where the testimony of the victims regarding "the crucial events" of the crime was consistent and largely corroborated by other evidence).

---

[5] Appellant presented no defense witnesses at trial, and he did not take the stand in his own defense.

[6] We note that the claims set forth in Appellant's third sufficiency claim are intertwined with those presented in his weight of the evidence claim, which we discuss below.

In his fourth issue, Appellant contends that, assuming, *arguendo*, this Court concludes "the evidence is sufficient (in the **Karkaria** sense) to sustain the verdicts, a new trial still should be granted" because the trial court's guilty verdicts are against the weight of the evidence.[7] Appellant's Brief at 39. Specifically, Appellant contends there were "many inconsistencies" in Ms. Whitman's testimony, and she had a motive to lie about whether Appellant or her paramour, Mr. Smith, was the aggressor.

When considering challenges to the weight of the evidence, we apply the following precepts: "The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none[,] or some of the evidence and to determine the credibility of the witnesses." **Commonwealth v. Talbert**, 129 A.3d 536, 545 (Pa.Super. 2015) (quotation marks and quotation omitted). Resolving contradictory testimony and questions of credibility are matters for the finder of fact. **Commonwealth v. Hopkins**, 747 A.2d 910, 917 (Pa.Super. 2000). It is well-settled that we cannot substitute our judgment for that of the trier of fact. **Talbert**, 129 A.3d at 545.

Moreover, appellate review of a weight claim is a review of the trial court's exercise of discretion in denying the weight challenge raised in the post-sentence motion; this Court does not review the underlying question of whether the verdict is against the weight of the evidence. **See id.**

_____

[7] Appellant challenged the weight of the evidence in his post-sentence motion. **See** Pa.R.Crim.P. 607(a).

> Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Id.* at 546 (quotation omitted). Furthermore, "[i]n order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Id.* (quotation marks and quotation omitted).

Appellant requests that we re-weigh the evidence and assess the credibility of Ms. Whitman, a task that is beyond our scope of review. As the trial court suggested, it, as the finder of fact in this bench trial, had the duty to determine the credibility of the testimony and evidence presented at trial. *See* Trial Court Opinion, filed 12/6/18, at 6. The trial court specifically "found the testimony of Diane Whitman to be credible." *Id.* The trial court heard from all of the witnesses, viewed the surveillance video, viewed the numerous exhibits, and heard the parties' stipulations. The trial court was free to weigh the evidence in rendering its guilty verdicts. *See Commonwealth v. Collins*, 70 A.3d 1245, 1251 (Pa.Super. 2013) (stating that "[a]n appellate court cannot substitute its judgment for that of the finder of fact."). Accordingly, we find no merit to Appellant's fourth claim.

In his final issue, Appellant contends the trial court abused its discretion in imposing a manifestly excessive sentence. Specifically, Appellant contends that, in imposing his sentence, "the trial court relied almost entirely upon the nature of the offense and [A]ppellant's prior record and ignored [A]ppellant's needs for rehabilitation in violation of 42 Pa.C.S.A. § 9721."[8] Appellant's Brief at 43. This claim presents a challenge to the discretionary aspects of Appellant's sentence. *Commonwealth v. Cartrette*, 83 A.3d 1030, 1041 (Pa.Super. 2013) (*en banc*) ("A sentencing court's failure to follow the pertinent aspects of [Section] 9721(b) do not result in an illegal sentence, but pertain to discretionary sentencing matters.") (citations omitted)).

We have long held that "[t]he right to appeal a discretionary aspect of sentence is not absolute." *Commonwealth v. Williams*, 787 A.2d 1085, 1087 (Pa.Super. 2001) (citation omitted). Instead, such challenges are considered petitions for allowance of appeal. *Id.* Generally, an appellant who wishes to challenge the discretionary aspects of his sentence must satisfy a four-part test to invoke this Court's jurisdiction:

> (1) whether the appellant has filed a timely notice of appeal; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence; (3) whether the appellant's brief has a fatal defect [pursuant to] Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appeal from is not appropriate under the Sentencing Code.

---

[8] It is not entirely clear whether Appellant is challenging the consecutive nature of his sentences or the individual sentences imposed. In any event, as discussed *infra*, we conclude Appellant is not entitled to relief on his discretionary aspects of sentencing claim.

*Id.* at 1087-88 (citations omitted).

Here, Appellant filed a timely notice of appeal, preserved his issue in a timely post-sentence motion, and included a separate Rule 2119(f) statement in his brief. Assuming, *arguendo*, Appellant's claim presents a substantial question permitting our review, we conclude Appellant's claim is meritless.

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Zirkle*, 107 A.3d 127, 132 (Pa.Super. 2014) (quotation omitted).

> When imposing a sentence, the sentencing court must consider the factors set out in 42 Pa.C.S.A. § 9721(b), that is, the protection of the public, gravity of offense in relation to impact on the victim and community, and rehabilitative needs of the defendant....Furthermore, [a] trial court judge has wide discretion in sentencing and can, on the appropriate record and for the appropriate reasons, consider any legal factor in imposing a sentence[.] The sentencing court, however, must also consider the sentencing guidelines.

*Commonwealth v. Shugars*, 895 A.2d 1270, 1275 (Pa.Super. 2006) (quotation marks, quotations, and citation omitted).

In the case *sub judice*, the record reflects that, during the sentencing hearing, the trial court was provided with Appellant's offense gravity scores, Appellant's prior record, and the sentencing guideline ranges. N.T., 9/25/18,

at 12-13. The trial court acknowledged that, while a presentence report was ordered, it was never prepared. *Id.* at 5. However, the trial court had before it, and considered, a mental health evaluation, as well as a defense-submitted psychosocial history report prepared by Candace C. Chang, MPA, Senior Mitigation Specialist. *Id.* The trial court acknowledged it considered a sentencing memorandum prepared by the Commonwealth. *Id.*

The Commonwealth presented the testimony of Rakesia Mitchell, who is Mr. Smith's niece. *Id.* at 6. Ms. Mitchell testified she and Mr. Smith were "very close." *Id.* at 7. She described Mr. Smith as a loving person who enjoyed family functions. *Id.* She explained that Mr. Smith's elderly mother saw the deceased lying in the street in a pool of blood and now has a fear of going outside. *Id.* at 9. Ms. Mitchell testified that she misses Mr. Smith, as do many of her cousins. *Id.* at 10. She explained that many of her cousins do not have father figures living in the household, and Mr. Smith fulfilled that role for them. *Id.* at 10-11. Ms. Mitchell testified Mr. Smith was "a male role model for the kids[.]" *Id.* at 11.

After Ms. Mitchell testified, the trial court informed the defense that it was "happy to hear whatever it is [the defense has] to say." *Id.* at 12. Appellant's counsel then made the following statement to the trial court:

> **[APPELLANT'S DEFENSE COUNSEL]:** [Appellant] was indoctrinated into a life of drugs and gangs and violence against his will. He did not make these choices. He was a child. He had no way to escape from that environment. Not only did that become, for lack of a better term, his norm, but there is [an] indication that maybe, because of that environment, who knows,

but he developed symptoms of some mental health disorders at a very young age; auditory hallucinations, visual hallucinations, suicidal ideations and thoughts. And, Your Honor, it led him to a life in and out of the criminal justice system; getting arrested for a case, maybe getting convicted, maybe it gets dismissed, and it's kind of the revolving door of his life. And [Appellant] was and did become a product of his environment because of what was thrust upon him.

I'm saying all this not to say that [Appellant] is unsavable. I believe the exact opposite is true. But I'm highlighting this to show that even the person that sat before you at trial, which was only a couple months ago, is not the person that is sitting before you today.

And just so the record is clear, Your Honor, I would like the record to reflect that [Appellant] is sitting at [the] counsel table, but he is in a wheelchair and he has what I would describe as, so the record is clear, a cervical collar, which is plastic and supports his neck and head.

Your Honor, since [Appellant] has been in custody, but even more since Your Honor rendered a verdict in this case, [Appellant's] physical health has been rapidly deteriorating. I don't want to get into terms of neuropathy and stuff like that, which is what he has, but he is losing not only sensation in his limbs, he is slowly losing the ability to use his limbs, unfortunately.

I didn't bring the records, but if Your Honor wants to review them, I would make them available to the Court. They are voluminous.

But in the medical records, it talks about a possibility of him maybe gaining mobility if he is given the proper rehab. But in the next sentence, it goes on to say that no rehab facilities are willing to take him as a patient because he is in custody.

I'm not going to talk bad about the state correctional facilities, they do the best with what they have, but he is not going to receive the proper rehabilitation to gain his mobility while in a state correctional facility.

[Appellant] very recently had spinal surgery. He has a, I'm using layman's terms, a compacted spine. It's degenerating. It is getting worse and worse with age. Not only that, [Appellant] is [an] insulin-dependent diabetic and has a lot of medical issues.

I'm saying this because it's important, Your Honor, as you know, we have individualized sentencing here. The sentencing is

supposed to go towards that individual that we are sentencing. I know Your Honor is aware of it, but I'm going to ask Your Honor, when you impose your sentence, that you focus on all five factors of sentencing, not just the retribution, incapacitation, and deterrence, but also the rehabilitative needs of the defendant and restoration. It's important.

And his physical deterioration is important, not because I want you to feel sorry for him. I just want you to give him the dignity which Your Honor gives to all human beings, which you give to all people before you in court, but it diminishes [Appellant's] capacity to re-offend. And not by choice.

[Appellant], I can tell you, this incident, he is remorseful. Your Honor heard the facts. I don't want to go back through them, but it is in essence a fight gone wrong. It was one stab wound that nicked an artery. You can replay that event 10 times and get 10 different outcomes. There was a stab wound to the groin, nicked an artery. That is why the young man died. If it was half an inch one way or the other, we would have an aggravated assault trial. That is important as to the facts of this case.

It's important in sentencing in knowing that [Appellant's] physical limitations, his physical deterioration, in and of itself, is enough to deter him from committing another crime because he will be physically incapable of committing other crimes, Your Honor.

Furthermore, when we take sentencing, we look at all factors. I know murder is a very serious offense. I'm not trying to minimize it. But on the same hand, murder of the third degree is not usually a crime that we sentence people to die in prison.

If [Appellant] were to get a lengthy sentence, the virtual effect of that would be that he dies in a state correctional facility. Once again, I'm not trying to minimize the impact of his crime. But [Appellant] deserves dignity as a human being. No one wants to die in prison.

It was a murder of the third degree. I don't believe there was any assertion whatsoever there was a premeditated, I'm going to go out and kill somebody, from [Appellant's] side of it.

But furthermore, Your Honor, if the state correctional system is unable to give [Appellant] some appropriate level of rehabilitation and medical [treatment], [Appellant] is going to be an elderly man. [Appellant] is now 57.

Is that correct, [Appellant]?

- 28 -

**[APPELLANT]:** 56.

**[APPELLANT'S DEFENSE COUNSEL]:** 56 years old, in a wheelchair in state prison, without the use of his limbs. What is he going to do? Once again, I understand. I'm not trying to say he shouldn't be punished, but that scenario, that is cruel and unusual.

So Your Honor, like I said, this is a heinous offense. It's a bad offense. Someone died. [Appellant] will allocute at the appropriate time, but I would ask that you take into account that [Appellant] does, in my opinion, and I hope in the Court's opinion, at least deserve a change to try to get out of a state correctional facility and resume some semblance of a life before he moves on.

For that purpose, Your Honor, I am going to ask you [to] take the guidelines in account, as Your Honor knows they are advisory, but I think [Appellant's] situation is unique. It deserves mitigation. It asks for mitigation. I would ask Your Honor to have mitigation and some compassion and human dignity for [Appellant], and I ask you to impose a sentence of 10 to 30 years.

*** 

Lastly, once again, [Appellant], it's been explained to him that a recommendation of a place of confinement is only that. It is a recommendation to the state department of corrections. However, Your Honor, SCI Laurel Highlands is the designated facility in the state for people with physical limitations who need a lot of medical treatment. So I ask, when Your Honor imposes the sentence, that you make a recommendation to the state department of corrections that [Appellant] serve his sentence at SCI Laurel Highlands.

*Id.* at 13-21.

In response, the Commonwealth highlighted the nature of Appellant's crime, as well as Appellant's fleeing, attempting to abandon the weapon, and attempting to conceal himself immediately after the stabbing. *Id.* at 21-22. The Commonwealth noted that the fifty-year-old victim was defenseless, "didn't see the attack coming," and did not fight Appellant prior to the

- 29 -

stabbing. *Id.* at 23. The Commonwealth explained that Appellant has been arrested twenty-five times over the course of his life, and he has had many opportunities with "all manner of treatments[.]" *Id.* at 25. The Commonwealth noted there has been "a pattern of behavior which is one that sort of discards to the wind things like rules and regulations and civil society." *Id.* The Commonwealth argued that Appellant had many chances to ask for additional help from the state and federal systems, and he failed to do so. *Id.* at 25-26. The Commonwealth indicated "[t]his is not a defendant that comes to us in a situation that is now new. So each [past] conviction was an opportunity to start over. Each conviction was a chance to better himself." *Id.* at 26.

The Commonwealth asserted that the public needs to be protected from Appellant, Appellant has demonstrated no sense of "personal responsibility," and the court cannot count on Appellant to not re-offend. *Id.* at 27-28. The Commonwealth noted Appellant has been in and out of prison, on probation, on parole, and treated by mental health professionals, yet he "killed a completely defenseless person." *Id.* at 28.

Moreover, the following exchange occurred between the trial court and the assistant district attorney ("ADA"):

> **THE COURT:** I understand what [the Commonwealth] mean[s], but do I not have to take into consideration—and I know what your argument is regarding the heinous nature of this crime. I heard the evidence. I know how the crime occurred. I know the steps [Appellant] took in an effort to dispose of the weapon and to conceal himself from the police. I know all that. But don't I

also have to take into consideration this current situation when I sentence him?

**[ADA]:** Yes.

**THE COURT:** I can't say three years ago, or whatever it was [when he committed the crime], that's the way he was. But this is now.

**[ADA]:** I completely agree. And [Appellant] in this case receives the benefit of not spending the rest of his life in prison on a life sentence, but the benefit of the sentencing guidelines are 17 and a half to 35. That's a kindness for this Court to show. What [Appellant] gets is 24-hour care, three meals a day, if not more, a bed, a roof over his head. He gets to live, and not in particularly bad conditions. He gets medical care, medical care that perhaps will find his miraculous recovery. Perhaps it will not. But he gets to have those things.

[Mr.] Smith gets nothing. Mr. Smith is dead in the ground. His mother, knock on wood, is not dying in her rehab center by not breaking her bones but breaking her spirit and breaking her heart.

**THE COURT:** I understand that. I have great sympathy for her and for the family for the loss they sustained. I know that. And for the deceased's mother to have sustained this kind of debilitating injury at her age is heartbreaking.

**[ADA]:** Counsel says nobody wants to die in prison. I agree. No one wants to die at all. Nobody wants to see their children die in front of them.

I'm not asking the Court to sentence [Appellant] to life. I'm asking the Court to give an appropriate sentence for the severity of the crime. Given [Appellant's] condition, we simply don't know—

**THE COURT:** Let me just ask this. I'm throwing this out as a question.

The guidelines for the DWE do take into account the fact that there was a deadly weapon. Can he also be sentenced consecutively for the weapon separate from the third degree?

**[ADA]:** He can be sentenced consecutively. The Court simply can't use the PIC and apply the deadly weapon standard to that because it's maxed out already.

I ask this Court ultimately, [Appellant], I'm sure now, will have remorse maybe. I mean, in his mental health evaluation he says it was an accident. He doesn't actually take into consideration any remorse. I feel I have—

**THE COURT:** Let me say this, and I think [Appellant] ought to hear me say this. I do not want to say, with regard to his claim in the mental health report that it was an accident. I'm satisfied it was not an accident. I just want that plain and clear. And the medical examiner's testimony was that this knife wound was six inches deep. It followed a path front to back, left to right, and downward. It's clear this was an intentional act. I have no problem with that.

**[ADA]:** I appreciate that, Your Honor.

The sentence that the Commonwealth is seeking is not wrathful. It is not extreme. It is an appropriate sentence given who this [Appellant] is, who he has been, who he potentially will be, and what he did, to protect the citizens of this city who would be at his mercy, and to protect himself perhaps from himself, and also to balance the scales, I'm asking for a sentence of 21 to 42 years.

**THE COURT:** Thank you.

*Id.* at 29-32.

The trial court permitted Appellant the right of allocution, and Appellant made the following statement:

First and foremost, I would like to apologize for having everyone here today. I apologize to the family, because it really was an accident. I really didn't intend to kill anybody, just place a little fear in him. I really didn't intend to kill the man. I really didn't….I'm sorry about what I did.

I also would like to say that I've been working on myself as I've been sitting for the last few years. I've taken the Wings program and several other programs, trying to get my life in order. You know what I'm saying? I don't look at me as a bad person.

What I did was bad, what I did was very bad, but it was not intentional. And I would just like to say I'm sorry for what I did and, you know, may the Lord forgive me, you know, because I

had no intention of killing anybody. Punch him and probably stick him one time just to scare him, yeah. But it only took the one stick and the man lost his life. And I'm very sorry for that. You know what I'm saying? I didn't mean to do it. I didn't mean for him to die or any of that. If I could take his place, I would. But as it be, I'm here and he's gone.

I have to accept whatever sentence the Court may impose upon me. You know what I'm saying?

I want to say I apologize, once again, to the family, the whole family. And I really didn't mean to kill your uncle. I really didn't.

*Id.* at 33-34.

At this point, the trial court stated the following in imposing sentence:

[Appellant], I do recognize there is a difference between an act that is not intentional but which is also not an accident. I accept your statement that you did not intend to kill. But it certainly was no accident. Certainly the crimes does rise to murder of the third degree. There is no issue in my mind as to that circumstance.

[Appellant], I know you've had a very, very difficult childhood. I don't want to get into great detail, but I want to review the psychosocial history report to some extent.

Your childhood included a remarkable degree of trauma such that you really didn't want to share it with the investigator. You did not. But eventually you did. Tragically, you were raised in a family which lived its life and gained its livelihood through illegal means. I realize that you were subjected to something called the 21W or the Peewees, but it was an age-eight crime-culture subgroup, which was one step short of being initiated into gang membership. And you viewed the 21W Peewee organization as an extension of your family life.

Again, tragically, your uncles were in charge of that organization. My heavens. That's a difficult thing to overcome.

The investigator indicates that because of the circumstances you were unable to walk away from that kind of lifestyle, because, if you did, you would be abandoned by the people who had nurtured you, if that's the right word, early in your life. For an eight-year-old [boy], that's awfully hard to do.

- 33 -

But that does not excuse. It may explain, but it certainly does not excuse your lifestyle. You've had a lifestyle in and out of criminal-justice issues, all sorts of issues, culminating in the most serious charge anyone can have and, that's a charge of murder.

I realize you had to cope with addiction throughout your life. At some point, at many points in your life, you felt that you wanted to end it all. There are reports of attempts to hurt yourself very seriously, even attempted to commit suicide, and the feeling of desolation on your part and the inability to cope with all the issues you had. But again, these are not excuses. That is all true.

You've been submitted and resubmitted to various medical facilities in an effort to deal with your mental health and drug problems. You were committed in 2009 to Albert Einstein Medical Center, to the mental health unit there, for suicidal ideation, and there was evidence, by marks on your arms, of your attempts to commit suicide. Your depression got worse and worse.

But the depression you felt about yourself and your inability to cope with your own issues, and I don't want to repeat myself but I have to, does not excuse whatever animosity you had towards Mr. Smith. It does not excuse it. Certainly, you realized that you committed a violent crime by attempting to leave the scene, by attempting to dispose of the evidence, by your actions, all of which indicate a consciousness of guilt. And it was clear.

Now, I am concerned that you do have certain limitations physically that apparently did not exist earlier. You're now wheelchair bound. You have a cervical collar which you need to support yourself. Your physical health has been deteriorating, and according to your attorney, you're losing the ability to use your limbs. With proper rehab, he feels you could regain some of your physical health, but he does not anticipate that would be available in state prison.

I am familiar with Laurel Highlands. I am familiar. I have been informed that facility does do work that other state facilities don't do. I don't know that they can help you cope with these physical limitations, but I have every reason to believe, if there is any facility in the state that can, that place can.

So the Commonwealth is recommending a sentence which is in the top end of the guidelines, and your lawyers have recommended a sentence which is within the guidelines and

which, under ordinary circumstances, would be a reasonable recommendation.

It's never easy to sentence someone to a lengthy state sentence, [Appellant], but that's part of what I have to do from time to time. And the sentence I'm about to impose will reflect what I consider to be the gravity of this offense, the need for society to be protected from you, recognizing that you will have an opportunity to leave prison if they could help you with your physical issues, and once you are paroled, to have the ability to further rehab.

\*\*\*

On the bill charging murder of the third degree, [Appellant] is sentenced to 17 and a half to 35 years. On the bill charging PIC, ordinarily I would merge that, I would not give a further sentence for that, but in this case, considering the circumstances, I think it needs to be an additional sentence for that crime. I impose a consecutive sentence of one to two years for possessing an instrument of crime.

*Id.* at 34-39. The trial court noted that it was recommending Appellant serve his sentence at SCI Laurel Highlands, but that the prison housing placement was beyond his control. *Id.* at 40.

Furthermore, in addition to the statement it made on the record at the sentencing hearing, the trial court confirmed in its Rule 1925(a) opinion that it considered the factors set forth in Section 9721(b). Trial Court Opinion, filed 12/6/18, at 6. The trial court noted:

Without any evidence of motive, provocation or self-defense, [Appellant] stabbed Mr. Smith in a vital part of his body. [Appellant], who in his 56 years, has acquired a substantial record of convictions and has proved himself to be a danger to the community. He took a life and needs to be punished. A long term of incarceration will protect the public from this impulsive and violent offender. During his term of incarceration, he will have many opportunities for training and rehabilitation.

- 35 -

*Id.* at 7.

After a careful review of the record, we conclude the trial court properly considered the factors set forth in Section 9721(b): the protection of the public, the gravity of offense in relation to the impact on the victim and community, and the rehabilitative needs of Appellant. Accordingly, we find no merit to Appellant's discretionary aspects of sentencing claim.

For all of the foregoing reasons, we affirm.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/24/19